**Albert WATSON, Jr., Appellant,**

v.

**UNITED STATES of America,
Appellee.**

**No. 21186.**

United States Court of Appeals
District of Columbia Circuit.

Argued Jan. 26, 1968.

Reargued En Banc June 25, 1969.

Decided July 15, 1970.

J. Skelly Wright, Circuit Judge, concurred and filed opinion.

Bazelon, Chief Judge, concurred in part and dissented in part and filed opinion.

Robb, Circuit Judge, dissented and filed opinion.

---

*On Rehearing En Banc*

Mr. Thomas G. Fisher, (appointed by this court) for appellant.

Mr. Philip Wilens, Atty., Department of Justice, of the bar of the Court of Appeals of New York, pro hac vice by special leave of court, for appellee. Messrs. David G. Bress, U. S. Atty. at the time the brief was filed, Albert W. Overby, Jr., Asst. U. S. Atty., and Harold H. Titus, Jr., now Principal Asst. U. S. Atty., were on the brief, for appellee. Messrs. Thomas A. Flannery, U. S. Atty., and Roger E. Zuckerman, Asst. U. S. Atty., also entered appearances for appellee.

Mr. Addison M. Bowman, for American Civil Liberties Union Fund as amicus curiae.

Before BAZELON, Chief Judge, and WRIGHT, McGOWAN, TAMM, LEVENTHAL, ROBINSON, MacKINNON and ROBB, Circuit Judges, sitting *en banc*.

McGOWAN, Circuit Judge:

This appeal from a conviction for federal narcotics offenses was heard by the

court *en banc* because it appeared to present important questions under Robinson v. California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962). These derived from the circumstance that appellant was undisputedly addicted to heroin, and the Government's case proved only that there was found in his possession 13 capsules—about one-half of his daily usage. Appellant raised in the District Court, and here, the issue of whether the Eighth Amendment, in the light of *Robinson*, barred his exposure generally to criminal prosecution and punishment and, in particular, invalidated as cruel and unusual the ten-year mandatory minimum prison sentence, bereft of the ameliorative possibilities of suspension, parole, or probation, which was imposed upon him. For the reasons hereinafter appearing, we leave appellant's conviction undisturbed, but vacate the sentence and remand for resentencing which shall include consideration by the District Court of the possible commitment of appellant under the provisions of the Narcotic Addict Rehabilitation Act of 1966. 18 U.S.C. §§ 4251–4255.

I

A. *The Trial Proceedings*

Appellant was indicted in two counts. One charged him with having "purchased, sold, dispensed, and distributed, not in the original stamped package and not from the original stamped package, a narcotic drug, that is, thirteen capsules" of heroin, in violation of 26 U.S.C. § 4704(a).[1] The other count asserted that appellant had "facilitated the concealment and sale of a narcotic drug, that is, thirteen capsules * * * after said heroin hydrochloride had been imported into the United States contrary to law, with the knowledge of [appellant]," contrary to the prohibitions of 21 U.S.C. § 174.[2]

The statutory references are not contained in the body of either charge, but the caption of the indictment includes the following:

"Violation: 26 U.S.C. 4704(a)
21 U.S.C. 174
(Possession of Narcotic Drug)
(Facilitation and concealment of sale of narcotic drug, knowing same to have been imported contrary to law)."

The complaint against appellant made by the arresting officer was for a violation of 26 U.S.C. § 4704(a), and alleged only that appellant did "unlawfully possess a narcotic drug, to wit, 13 capsules of heroin." Appellant's commitment papers pending grand jury action reiterate exactly this language of the complaint, although neither 26 U.S.C. § 4704(a) nor 21 U.S.C. § 174 purports in

1. 26 U.S.Code § 4704(a):
 (a) "It shall be unlawful for any person to purchase, sell, dispense, or distribute narcotic drugs except in the original stamped package or from the original stamped package; and the absence of appropriate taxpaid stamps from narcotic drugs shall be prima facie evidence of a violation of this subsection by the person in whose possession the same may be found."

2. 21 U.S.Code § 174:
 "Whoever fraudulently or knowingly imports or brings any narcotic drug into the United States or any territory under its control or jurisdiction, contrary to law, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of any such narcotic drug after being imported or brought in, knowing the same

to have been imported or brought into the United States contrary to law, or conspires to commit any of such acts in violation of the laws of the United States shall be imprisoned not less than five or more than twenty years and, in addition, may be fined not more than $20,000. For a second or subsequent offense (as determined under section 7237(c) of the Internal Revenue Code of 1954), the offender shall be imprisoned not less than ten or more than forty years and, in addition, may be fined not more than $20,000.
 "Whenever on trial for a violation of this section the defendant is shown to have or to have had possession of the narcotic drug, such possession shall be deemed sufficient evidence to authorize conviction unless the defendant explains the possession to the satisfaction of the jury."

terms to make possession a substantive offense.

No pretrial challenge to the indictment was made, and trial before a jury in the District Court ensued after a commitment, upon appellant's motion, to St. Elizabeths Hospital for a mental examination resulted in a finding, which was not then or thereafter challenged by appellant or his counsel, that appellant was competent to stand trial. The report also stated that appellant was without mental disease or defect at the time of the alleged offense.[3]

The Government's case consisted of the testimony of two witnesses. Sergeant Didone of the Metropolitan Police testified that he obtained a search warrant for an apartment in which appellant was residing. In company with two other officers, he executed the warrant. Appellant was found in bed and, when asked whether he had any narcotics on the premises, directed the officers to look in the fly of his trousers lying on a nearby table. The officers found there a small envelope, bearing no tax stamp but containing 13 capsules of a white powder. The envelope and its contents were seized, and appellant was arrested. A preliminary field test by Sergeant Didone upon his return to the narcotics squad office showed the presence of an opiate element in the capsules.

The second prosecution witness was a government chemist, who testified that his analysis of the capsules revealed the presence of heroin, albeit in an undetermined amount.

Appellant did not testify in his own defense, which defense was represented to be the absence of guilt by reason of insanity. Two witnesses testified in support of that defense. One was Dr. Baughman, a psychiatrist on the St. Elizabeths staff, who had examined appellant during his commitment. He diagnosed appellant as having a "schizoid personality," currently and as of the time of the offense. He also characterized appellant as being a narcotics addict and, in this connection, he related what he had been told, but which he had not verified, as to appellant's narcotics history. This was said to have begun when appellant was in an Army hospital in Japan, receiving treatment for a battle wound suffered in the Korean War. Morphine was then given appellant by the Army to ease his pain. After the official treatment injections were discontinued, appellant began to receive heroin from a Japanese nurse who sympathized with his plight. He thereby became addicted, and in civilian life became a regular user of heroin except for those periods when he was successively in prison on two separate narcotics violations. In 1963, while on parole from one of such convictions, appellant began to relapse. He voluntarily reported this to his parole officer and thereafter consented to an arrest for parole violation and a return to the United States Public Health Service Hospital at Lexington, Kentucky, where he had earlier served two years of his second sentence. After he came out of Lexington, he stayed off heroin for some nine months while going to school, but again resumed his use of heroin and dropped out of school.

Dr. Baughman testified at length about appellant's emotional insecurity and the reason for it. He conceded that appellant had "some freedom of choice"

---

3. Appellant was released upon his personal bond pending trial, but that bond was revoked within a few weeks because of the violation of release conditions and appellant's apparent return to the use of narcotics. Before his return to custody, appellant was arrested on a charge of carrying a deadly weapon (loaded pistol); he pleaded guilty in General Sessions Court and was sentenced to confinement for one year. These events prompted appellant's appointed counsel to seek a mental examination. In his supporting affidavit describing his conferences with appellant, counsel related appellant's inability to explain these lapses, except that his addiction was of long standing and that he was under great emotional strain because he had gone to his father's house directly upon release and had been turned away as unwelcome.

and "knew what was legal and what was not legal."

The other defense witness was Dr. Stammeyer, a clinical psychologist at St. Elizabeths who had also examined appellant during his commitment and subjected him to a number of psychological tests. He characterized appellant as having a "personality disturbance probably best classified as a paranoid personality."

The Government's rebuttal witness on the insanity defense was Dr. Platkin, a St. Elizabeths psychiatrist who was Dr. Baughman's supervisor. He expressed his view to be that appellant was not afflicted by mental illness at the time of the offense. Dr. Platkin professed himself to be satisfied that appellant was a narcotics addict, but did not find his addiction to be an indication of mental illness.

At the conclusion of this evidence, the court was asked by the defense to direct a judgment of acquittal on the ground of insanity, but declined to do so. Acquittal was then requested "on constitutional grounds in view of the decision in the *Robinson* case that it would be improper to criminally incarcerate an addict for his addiction." The trial judge, without expressly ruling on the motion, observed that it depended on the fact of addiction, and that this latter question was one for the jury along with the insanity issue. Appellant's counsel appeared to acquiesce in this reasoning, and did not press the matter further, although he asked that the motion remain of record.[4]

Neither side responded affirmatively to the court's invitation to submit instructions, and those thereafter given were not objected to in any particular. There was no instruction that, if the jury found appellant to be an addict, it should acquit. The jury brought in a verdict of guilty; and in due course the Government filed an information as to appellant's prior convictions. These were two federal narcotics convictions, described in the language of the information as set forth in the margin.[5] As it was required to do under the statute by reason of these convictions, the court sentenced appellant to ten years imprisonment on each count, with neither suspension, probation, nor parole available to him. 21 U.S.C. § 174; 26 U.S.C. §§ 4704(a), 7237(a) and (d).

The sentences were directed to run concurrently with each other, and with the General Sessions sentence on the weapons charge. The court itself brought up the question of a recommended commitment to the hospital at Lexington and, after

4. The brief colloquy ended, as follows:
 [Defense Counsel]: The only point I wanted to make is that in the Robinson case the holding was that an addict could not be criminally incarcerated for his addiction. We are not dealing with a crime of addiction, but we are dealing with the crime of possession, which is so closely related to addiction that it becomes one and the same, in effect.
 THE COURT: Well, I think you are assuming that what you have shown is addiction, and the result depends on what the jury has been shown here. I don't know what they think has been shown, but it has to be submitted to them. They may think that he has an addiction, but they may on the other hand think that he doesn't have the addiction, or that he is not insane.
 [Defense Counsel]: I see your point, Your Honor. However, I would like to leave the motion on the record.
 THE COURT: Yes, certainly. * * *

5. 1. On or about August 31, 1953, the defendant was charged in the United States District Court for the District of Columbia with violations of the Federal narcotic statutes in Criminal Case No. 1379–53; was found guilty on or about April 26, 1954, of four counts of the indictment charging violations of 26 U.S.C. 2253a [sic] and 2554a (Harrison Narcotic Act); and was sentenced to imprisonment for twenty months to five years on or about May 7, 1954.
 2. On or about August 2, 1954, the defendant was charged in the United States District Court for the District of Columbia with violations of the Federal narcotic statutes in Criminal Case No. 831–54, pleaded guilty on or about January 10, 1955, to three counts of the indictment charging violations of 26 U.S.C. § 2553(a) and § 2554(a) and 21 U.S.C. § 174 (Harrison Narcotic Act and Jones-Miller Act) and was sentenced to imprisonment for five years.

receiving an affirmative answer to its inquiry of appellant as to whether he was an addict, recommended that the sentence be served in Lexington. This recommendation has not been carried out because, with the passage of the Narcotic Rehabilitation Act of 1966, the Lexington Hospital no longer accepts for treatment persons serving regular prison terms, but takes only those who are eligible for disposition under that Act. Appellant was not so eligible by reason of his two prior narcotics convictions; and he is serving his sentence in the prison facilities of the District of Columbia.

B. *The Appellate Proceedings.*

On appeal to a division of this court, appellant addressed himself principally to the failure of his insanity defense. He urged that the court erred in (1) refusing to direct an acquittal on the insanity ground and (2) giving a misleading instruction on this issue. He continued, however, to press his assertion that the evidence of record showed no more than that appellant was an addict possessed of a supply of narcotics for his own use; and his constitutional formulation was, alternatively, that (1) if the insanity defense was unavailing, there was a failure of due process in the law's omission to provide a defense of involuntariness derived from the compulsions of his addiction, or (2) Robinson v. California, *supra,* barred the ten year mandatory sentence under the Eighth Amendment.

The Government, like the appellant, devoted most of its attention to the insanity point. In the page and a half of its brief devoted to the constitutional claim, it relied mainly upon earlier decisions in this court which have refused to pursue the Eighth Amendment argument as one "more properly to be made to the Supreme Court." Castle v. United States, 120 U.S.App.D.C. 398, 401, 347 F.2d 492, 495 (1964), cert. denied, 381 U.S. 929, 85 S.Ct. 1568, 14 L.Ed.2d 687 (1965). It characterized the Court's opinion in *Robinson* as explicitly disclaiming any purpose to restrict the criminal prosecution of addicts to what the Court characterized as "crimes involving the sale, purchase or possession of narcotics," and the Government asserted that appellant was not convicted "for being an addict, but for the purchase and sale of narcotics."

The division which heard the appeal issued an opinion on December 13, 1968. Chief Judge Bazelon, writing for himself and Judge Robinson, found no error in respect of the trial court's handling of the insanity defense, and, accordingly, left the jury's verdict of guilt intact. On the constitutional side, the opinion appeared to turn aside appellant's due process contention by referring to insanity and pharmacological duress as alternative defenses. *See* Note 18 of the division's opinion. Its focus was upon the *Robinson* contention that the Eighth Amendment either forbade any criminal punishment of appellant at all, or a punishment as severe as ten years without probation or parole. As to the former, although the opinion noted the logical problems inherent in *Robinson's* seeming differentiation between punishing addiction, on the one hand, and punishing possession for use, on the other, it thought that their resolution could come only from the Supreme Court. Any ardor it might have had to undertake this task was confessedly cooled by the subsequent expressions of the Court in Powell v. Texas, 392 U.S. 514, 88 S.Ct. 2145, 20 L.Ed.2d 1254 (1968), where a bare majority found the Eighth Amendment no impediment to the criminal prosecution and punishment of a chronic alcoholic for public drunkenness.

Although Judges Bazelon and Robinson asserted a belief that *"Powell* does not preclude a holding that the eighth amendment prohibits punishing an addict for possessing narcotics exclusively for his own use," they did feel that *Powell* puts "an unusually heavy burden of proof" upon one who contends that the punished conduct was compelled by a disease. Looking to the record, they thought that this burden was not met by appellant to the degree "required in the light of *Powell,* to bar any punish-

ment whatever under the eighth amendment."

What the opinion did purport to hold was that the particular sentence mandated for appellant was so excessive in its length and harsh in its incidence as to fall afoul of the Eighth Amendment's ban on cruel and unusual punishments. How to implement this holding was, however, professed to present a dilemma posed by a doubt as to this court's power to prescribe a lighter sentence, on the one hand, and a disinclination to trench upon the traditional legislative primacy in establishing sentencing policy, on the other. Thus, definitive disposition was postponed while the parties were invited to submit their views as to what that disposition should—or could—be.[6]

The issuance of the division's opinion was first followed, however, by motions to extend the time for the invited responses until after action on certain other motions. One was a motion by appellant that the Government produce medical records of the D.C. Jail which allegedly would show narcotics withdrawal symptoms by appellant after his arrest. This was denied, as was also a motion by the Government to remand the record to the District Court for the purpose of enabling the Government to show that appellant was a seller, as well as a user, of narcotics. This motion had been preceded by the Government's filing with the court, pursuant to the court's inquiry at oral argument as to what was known, if anything, of appellant as a trafficker, the record of the proceedings relating to the issuance of the search warrant and the return thereon.

Sergeant Didone's affidavit in support of the warrant relates that, four days before the search and arrest, an informer under police supervision purchased heroin capsules from appellant in the latter's

apartment, observing other capsules in the room and being told by appellant that more were available for purchase if he wished to return. The property to be searched for was, in the language of the warrant, "heroin, syringes, tourniquets, cookers and paraphernalia used in the preparation of heroin for retail," any other paraphernalia "used in the preparation and dispensation" of heroin, and "any other narcotic drugs illegally held." The property seized is inventoried in the return to the warrant as follows:

"Cream colored envelope containing 13 caps of white powder

Nylon stocking containing 2 bottle cap cookers

1 eye dropper syringe, 2 plastic syringes, 6 needles

Cream colored envelope containing 1 bottle top cooker, 1 eye dropper syringe

2 cream colored envelopes

Miscellaneous papers"

The submissions requested by the parties as to the propriety and extent of a lesser punishment were, however, received in due course, but they did little, if anything, to dispel the dilemma described in the court's opinion. The Government adduced legislative history which purported to show that Congress, in fixing the mandatory penalties in the Narcotics Control Act of 1956, did not intend to distinguish between mere possessors of, and traffickers in, narcotics. It also thought to find in the scheme of the Narcotic Addict Rehabilitation Act of 1966 a purpose to put behind prison walls for a long stay those who are, in the Government's words, "consistent narcotic offenders * * * no matter what the reason for their consistent violations of the law."

The Government thus concluded that, in view of the plenary power and the

6. In a separate opinion, the third member of the division (Judge McGowan) professed (1) to be unable "to understand how, short of being given narcotics under duress, one can be a narcotics addict without periodically possessing narcotics" for personal use, and (2) to share Justice White's observation in *Powell* (at pp. 548–549 of 392 U.S., at p. 2162 of 88 S. Ct.) that "[U]nless *Robinson* is to be abandoned, the use of narcotics by an addict must be beyond the reach of the criminal law."

patent purpose of Congress to fix mandatory prison terms for mere possessors, nothing could be done by way of visiting a lighter punishment upon appellant than the one he now bears. Should the court persist in its assertedly erroneous course, however, and require some amelioration of appellant's sentence, the "only possible alternative" which the Government could suggest was that the court's self-kindled constitutional flame should consume only so much of the statutory penalty provision as withheld from third and subsequent offenders, found only in possession of narcotics, the possibility of parole. This could, so it was said, conceivably be rationalized on (1) the theory that what is cruel and unusual about appellant's sentence is the denial of parole and (2) the severability clause of 26 U.S.C. § 7852.

Appellant's response to the court's plea for help was even more uncompromising. He spurned the bone of parole availability proffered by the Government. He saw neither divisibility in the statutory sentencing structure, nor any authority in 28 U.S.C. § 2106 for the court to order a reduction in the sentence. He made for the first time an argument, derived from an extensive examination of the origins and subsequent history of the Jones-Miller and Harrison Acts, that Congress never intended the substantive provisions under which appellant was convicted to apply to one who is shown to be only an addict-possessor. His conclusion was that the court was empowered to do nothing except to direct the dismissal of the indictment against appellant. Were the court determined to surmount these limitations by main strength and adhere to its purpose to modify the punishment, appellant expressed a preference for parole subject to the condition that he participate in one of the public or private treatment programs currently functioning in the District of Columbia.

The matter was in this posture when the court concluded *sua sponte* to place the appeal *en banc*. The parties filed no new or further briefs, but a comprehensive brief was received from *amicus curiae*, who was also permitted to participate in the oral argument before the full bench.

Not long after the case was taken under submission, it appeared that grants by the Supreme Court of *certiorari* in certain cases involving the legality of the presumptions contained in 21 U.S.C. § 174 and 26 U.S.C. § 4704(a) raised the possibility that this appeal might turn on an issue not heretofore raised; and the court accordingly entered an order holding the matter in abeyance pending decision by the Supreme Court of the cases in question. When those decisions were forthcoming, however, they were without effect upon appellant's conviction. Turner v. United States, 396 U.S. 398, 90 S.Ct. 642, 24 L.Ed.2d 610 (1970). *And see* Minor v. United States, decided together with Buie v. United States, 396 U.S. 87, 90 S.Ct. 284, 24 L.Ed.2d 283 (1969).

*Amicus curiae*, in its brief and argument to the court *en banc*, urged that (1) *Robinson* interposed a constitutional barrier to any criminal punishment of an addict who, like appellant, was found in possession of a small amount of heroin consistent with his own daily usage, (2) the availability of the familiar insanity defense falls short of bridging the constitutional gap opened in the law by *Robinson*, and (3) the eligibility classification founded upon two prior felony convictions, contained in the Narcotic Addict Rehabilitation Act, and in this instance comprised of two prior narcotics offenses, denied equal protection to appellant in rendering him disqualified for disposition under that Act. *Amicus* pointed out, in addition, that both the Eighth Amendment and the equal protection issues could be avoided by construing §§ 4704(a) and 174 as inapplicable to an addict-possessor, and pressed this course on the court. In this latter regard, however, it did not, as had appellant in his supplemental memorandum responding to the division's opinion, essay to demonstrate an actual intent by the

Congress to restrict those statutes to traffickers.

In stating its conception of the alternative dispositions available to the court, *amicus* asserted that construing §§ 4704 (a) and 174 as inapplicable to appellant would necessitate dismissal of the indictment against appellant, unless the court felt that further documentation of appellant's addiction was required as a predicate for that action, in which event a remand for this purpose would be in order. For the future, under such a construction, "the appropriate procedure," in the words of *amicus*, "would be to require defendants to proceed by motion to dismiss the indictment * * *," with an inquiry to be made, if necessary, into the facts of addiction.

In common with appellant, *amicus* could discern no basis for the imposition of a lighter sentence upon appellant than the one presently in being. Thus, the only avenue open to the court under the majority opinion for the division was said to be dismissal of the indictment.

Were the court to look with favor upon the constitutional challenge to the eligibility definitions of the Narcotic Addict Rehabilitation Act, the severability clause of that Act was said by *amicus* to warrant the invalidation of the prior conviction disqualification, leaving the rest of the Act available for the exercise of the sentencing court's discretion under it upon remand for that purpose.

Lastly, said *amicus*, if the court was impelled to formulate a new defense of involuntariness for addicts not equatable to the traditional insanity defense, then a fair trial could be had for appellant upon reversal of his existing conviction and remand for a new trial.

## II

■ The effect of our order placing this appeal *en banc* is, of course, to vacate the division's opinion; and we are, accordingly, required to address ourselves in the first instance to appellant's claims of error in respect of the treatment in the trial court of his insanity defense. We are not persuaded that it was error for that court to commit that defense to the judgment of the jury. The record reveals the familiar pattern of conflicting expert testimony as to whether appellant's offense was the product of an "abnormal condition of the mind which substantially affects mental or emotional processes and substantially impairs behavioral controls." McDonald v. United States, 114 U.S.App.D.C. 120, 124, 312 F.2d 847, 851 (1962). *And see* Durham v. United States, 94 U.S.App.D.C. 228, 214 F.2d 862 (1954). The trial court regarded appellant's showing, which included testimony as to his drug addiction, as raising an insanity issue worthy of jury consideration, and we are not warranted in now saying that appellant was entitled on the evidence as a whole to a directed verdict.

■ As for the instructions, appellant sought none, and represented himself at trial as satisfied with those actually given. The errors now claimed to infect them are not strictly cognizable upon appeal, Rule 52, Fed. R. Crim. P., and, in any event, are far from being plain errors affecting substantial rights, if indeed they be errors at all.[7]

7. Appellant's principal claim of reversible error in the charge is that the court "stated or implied that in order to find appellant not guilty by reason of insanity appellant must have a *total*—rather than a *substantial*—lack of ability to refrain from doing" the wrongful act charged. But the court nowhere used the word "total," and appellant concedes that the court correctly defined at the outset of its instructions the "mental disease" which would absolve appellant as "any abnormal condition of the mind which *substantially* affects mental or emotional processes and *substantially* impairs behavior controls." (Emphasis supplied.) Its references thereafter, of which appellant now complains, to the jury's duty to determine whether appellant had the "ability or lack of ability" to refrain from wrongful action were framed, and undoubtedly understood, in the light of the earlier definition.

■ Neither do we think that this appeal, contrary to the contentions made by both appellant and *amicus* for the first time in this court, is properly to be disposed of by the formulation by us of a new test of criminal responsibility for narcotics addicts which departs significantly from the existing insanity defense. Apart from the fact that appellant was content to defend himself in the trial court solely on that traditional formulation and we have no record to inform us which was sought to be made by reference to some other standard, there are other problems in this approach to the extent that it is derived, as it largely purports to be, from the Eighth Amendment.

■ First, as Judge Bazelon concluded in his opinion for the division, the Supreme Court in *Powell* has left this matter of criminal responsibility, as affected by the Eighth Amendment, in a posture which is, at best, obscure. The majority in that case unmistakably recoiled from opening up new avenues of escape from criminal accountability by reason of the compulsions of such things as alcoholism and, presumably, drug addiction—conditions from which it is still widely assumed, rightly or wrongly, that the victim retains some capacity to liberate himself. In any event, so the opinion for the division concluded, *Powell* at the least contemplates a heavy burden of proof on one who claims to the contrary, and this record finds appellant short of discharging that burden. We read it so, as well.

■ Second, with the advent of *Powell,* this jurisdiction is one of the few in the country of which it can be said with some confidence that the law is settled that chronic alcoholism, manifesting itself as public drunkenness, is not criminally punishable. And this is so because the result we reached in Easter v. District of Columbia, 124 U.S.App.D. C. 33, 361 F.2d 50 (1966), rested upon a ground alternative to that of the Eighth Amendment as expounded in *Robinson. Compare* Driver v. Hinnant, 356 F.2d 761 (4th Cir. 1966); *and see* Merrill, Drunkenness and Reform of the Criminal Law, 54 Va. L. Rev. 1135, 1150–1151 (1968). This experience is not such as to encourage us, in the absence of further elucidation by the Supreme Court of the Eighth Amendment, to give it an expansive reading in respect of standards of criminal responsibility.[8]

### III

We turn next to the question of whether appellant is, or can constitutionally be brought, within the reach of the statutes under which he has been convicted. In defining this issue, it is important to keep in mind precisely what those statutes provide. They do not make mere possession of narcotics a crime, although the practice is widespread of referring to it as if it were, as witness the caption of appellant's indictment which identifies his alleged violation of § 4704(a) as "Possession of Narcotic Drug." What that particular statute makes unlawful is the act of purchasing, selling, dispensing, or distributing narcotics except in or from the original stamped package. Possession gets into the picture only because Congress went on to provide that the absence of the stamps "shall be prima

---

8. Only the Eighth Amendment is referred to in the section of *amicus's* brief under the heading "Constitutional and Statutory Provisions Involved." Argument I of its Summary of Argument explicitly rests on *Robinson,* and Argument II, which sounds the call for a new test of criminal responsibility, starts by saying that "[T]he availability of an insanity defense does not bridge the constitutional gap discussed in Argument I." In the body of the brief arguing for a new formulation, no reference is made to any provision of the Constitution, although appellant himself has suggested in his papers that due process requires a new definition of criminal responsibility beyond that of insanity. What is asked for by *amicus* is in essence a doctrine of pharmacological duress, a defense which Judge Bazelon for the division majority assumed to have been available to appellant but to involve a heavy burden of proof not met by appellant on this record. As noted above, appellant's post-decision motion to produce alleged evidence of withdrawal symptoms immediately after arrest was denied by unanimous vote of the division.

facie evidence of a violation of this subsection by the person in whose possession the same may be found." In other words, possession of unstamped narcotics will, without more, permit a finding that the possessor has purchased, sold, dispensed or distributed narcotics upon which the appropriate taxes have not been paid.

Similarly, 21 U.S.C. § .174 does not make possession a substantive offense. It prohibits the acts of importing into the United States any narcotic drug contrary to law; or of receiving, concealing, buying, selling, or in any manner facilitating the transportation, concealment, or sale of, any such drug; or of conspiring to commit any of such acts. Possession appears in the statute only as being "sufficient evidence to authorize conviction unless the defendant explains the possession to the satisfaction of the jury."

Thus it is that proof by the prosecution of possession alone makes possible the conviction of a defendant for any one or more of a variety of prohibited acts as widely different as selling a narcotic, on the one hand, and buying or receiving it, on the other. Indeed, it is the common practice for indictments to charge conjunctively all the substantively forbidden acts, and for the evidence adduced at trial to show merely possession.

The effect of all this is that the non-addict dealer in large quantities of narcotics is, for purposes of substantive violations, lumped with the addict who possesses narcotics solely for his own use. Of course it is true that, as a practical matter, no addict can possess narcotics without buying, receiving, or concealing them—acts which, as was stated by one judge of the division, are "realistically inseparable from the status of addiction." So it is that, if *Robinson's* deployment of the Eighth Amendment as a barrier to California's making addiction a crime means anything, it must also mean in all logic that (1) Congress either did not intend to expose the non-trafficking addict possessor to criminal punishment, or (2) its effort to do so is as unavailing constitutionally as that of the California legislature.

 It is possible, as appellant has done in his supplemental memorandum in response to the division's opinion, to raise a serious question as to whether Congress ever intended to include the non-trafficking addict possessor within the reach of the substantive prohibitions of § 4704(a) and § 174.[9] Any such ques-

9. Appellant's detailed and not implausible analysis of this issue was in response to the Government's effort in its supplemental memorandum to demonstrate, by reference to the legislative history of the penalty increases made by Congress in 1956, the intent to treat the addict-possessor the same as addicts or non-addicts proved to be trafficking. But, as appellant cogently asserts, changes in penalties are not the same as changes in the substantive definitions of crimes. He points out that § 174 is part of the Jones-Miller Act, passed in 1909 and derived from an anti-smuggling law of 1866. Its purpose was to prevent the flow of narcotics into the country, and it was founded on the Commerce Clause.

Section 4704(a), by contrast, is part of the Harrison Act originally enacted in 1914 and cast in the form of a taxing measure because of fears for the constitutionality of reliance upon the commerce power. The objective of the Harrison Act was to prevent legally imported narcotics from making their way, ordinarily through the activities of physicians, into unauthorized hands. *See*, in this regard, United States v. Jin Fuey Moy, 241 U.S. 394, 36 S.Ct. 658, 60 L.Ed. 1061 (1916), where the Supreme Court appears to have held that mere possession of a small amount of narcotics for personal use did not bring into operation the statutory presumption of illegal acts. Although the Harrison Act succeeded in its goal of regulating and containing lawfully imported drugs in lawful channels, it failed, as one acute observer has said, "to cope with the enormous flow of smuggled drugs that are distributed to addict-consumers without ever entering the regulated channels at all." King, Narcotics Drug Laws and Enforcements Policies, 22 Law & Contemp.Prob. 113, 118 (1957).

When, after World War II, Congress turned its attention to the formidably increased and increasing illicit drug traffic, it focused that attention only upon penalties, and not upon the substantive

tion becomes all the more significant as *Robinson* evokes the prospect of the possible constitutional invalidity of those statutes as applied to the non-trafficking addict possessor. We do not believe, however, that resolution in these terms of the appeal immediately before us is warranted. This is so because it is vital that a person charged under these statutes who defends on these grounds should do so clearly and unequivocally in the trial court, to the end that a record can be made of the facts upon which they rest. This was far from being the case in this instance.

As related above, appellant made no direct effort to explain his possession of the 13 capsules. His defense was insanity, and the defense testimony came solely from a psychiatrist and a psychologist. The former particularly related certain hearsay facts about appellant's addictive history, but even those did not exclude or negate the possibility of trafficking or that the 13 capsules in question might have been available for sale. We cannot be entirely oblivious of

the affidavit supporting the search warrant which recites a sale, and a continuing purpose to sell, by appellant four days before he was arrested, nor of the Government's offer to prove, albeit belatedly, that appellant was a seller.[10] This is, in short, not the kind of a record upon which either the trial or appellate court can confidently adjudicate a serious issue of statutory construction with constitutional implications.

For the future, the addict, whose acquisition and possession of narcotics is solely for his own use and who wishes to defend on these grounds, is surely not at a loss to know how to do so. His challenge is not merely to greater, as opposed to lesser, degrees of criminal punishment. To the extent that he wishes to assert that the statutes are not to be read as applicable to him, his primary attack should, as *amicus* suggests, be by a motion to dismiss. Such a motion would presumably make an alternative claim of the constitutional defectiveness, under *Robinson,* of the statutes as applied to him.[11]

provisions of the existing laws. In 1951, and again in 1956, it markedly enhanced the severity of the punishments to be meted out upon conviction. Despite a fervent plea by the American Bar Association for a reexamination of the substantive scheme and a warning that the confusions and obscurities of that scheme raised the possibility of prisons crammed with addicts serving mandatory sentences, the Congress persisted in its apparent belief that all that was needed was larger penalties. It did not abandon this approach until it passed the Narcotic Addict Rehabilitation Act of 1966.

Appellant asserts that, although it is clear that Congress did not distinguish between the addicted and the non-addicted *trafficker* in its preoccupation with punishment, it is by no means clear that it grouped the mere addict *possessor for use* with these other categories. And, of course, mere amendment of punishments does not, in and of itself, alter the substantive definition of crimes in the underlying statutes. It is appellant's submission that the latter were never intended to embrace the non-trafficking addict possessor, and that words like "purchase," "receive", and "conceal" were used in

relation to acts of participation in illegal importation, trading, and distribution.

10. As the division's opinion notes, the Government, at the oral argument before the division and on other occasions, has represented that it is not its policy to pursue under the statutes in question persons whom they do not believe to be traffickers. These informal assurances are, however, hardly a substitute for facts of record.

11. Rule 12, Fed.R.Crim.P., deals with the raising of defenses and objections before trial. Rule 12(b) (1) contemplates that any defense or objection to the indictment "which is capable of determination without the trial of the general issue may be raised before trial by motion;" and of course it is true that it is in the interests of good judicial administration that they shall be so raised whenever possible. Whether a defendant is a non-trafficking addict possessing narcotics solely for his own use would not appear to be the same as the general issue of whether he was in possession of narcotics as charged in the indictment. It would appear rather to partake of the nature of a defense to the effect that possession under such circumstances has not been made criminal under the statutes as properly construed,

In this fashion important issues, which have been both belatedly raised in this proceeding and uniformly submerged under the presentation of an insanity defense, can hereafter be meaningfully pursued by a defendant who is prepared to take his stand upon these positions and, where necessary to the exculpatory approach being advanced, to proffer the factual foundations for them. A defendant raising these matters as affirmative defenses at trial presumably must bear the burden of going forward with evidence which places him in the category of an addict in possession of narcotics solely for his own use. If the prosecution disputes that evidence by a showing of its own, the burden of persuasion beyond a reasonable doubt would appear to rest upon it. The analogy of the traditional insanity defense is instructive in this regard.

If a court should rule as a matter of law that the statutes either do not, or cannot constitutionally, encompass non-trafficking possessors for personal use, then an indictment which does not allege acts of trafficking arguably would be subject to dismissal as not stating a crime which the court has jurisdiction to try.

Neither of these possible approaches has been pursued here. We think that definitive rulings with respect to them cannot meaningfully be made on such a record, and are more properly to be left to the orderly processes of adversary litigation beginning at the trial court level, and with fact-finding sufficiently close in point of time to the events in question as to assure its integrity. That is the only way we know of whereby judicial, as distinct from legislative, relief, at both the trial and intermediate appellate levels, may be sought by the non-trafficking addict from the rigors of criminal prosecution under the existing federal narcotics statutes. It is certainly the only way by which the Supreme Court can, as the final arbiter of these issues, be effectively entreated to explain, more fully than it has done so far, how it is that California may not, consistently with the Federal Constitution, prosecute a person for being an addict, but the United States can criminally prosecute an addict for possession of narcotics for his personal use.

In viewing these issues as inappropriate for resolution either now or by means of a remand, we are far from leaving appellant as we found him. Although his conviction is sustained, his sentence is, pursuant to Part IV of this opinion, being vacated with directions that he be regarded on resentencing as eligible for non-criminal disposition under the Narcotic Addict Rehabilitation Act. *Amicus* itself has represented to us, Note 15 *infra*, that this action on our part "would in large measure" obviate appellant's "problem." It is also true that we are in a field of law which is as complex as it is of critical concern to society; which is not static in terms of emerging medical and psychiatric information of relevance; and which, accordingly, lends itself best to step-by-step development.

### IV

It is obvious from the transcript of the sentencing proceedings that the trial court did not regard appellant as eligible to be considered for disposition under the provisions of Title II of the Narcotic Addict Rehabilitation Act of 1966. This is apparent from the circumstance that, after having obtained confirmation by appellant of the two prior narcotics convictions recited in the information, the court sentenced appellant to the minimum prison terms made mandatory by statute. The court's seeming appreciation of appellant's addiction was then promptly manifested by its raising the question of whether appellant wished to be recommended for

---

or cannot be made criminal without colliding with the Constitution. Hearings on a pretrial motion raising defenses and objections may always, in the trial court's discretion, "be deferred for determination at the trial of the general issue." Rule 12(b) (4).

service of sentence in Lexington, and by making that recommendation after receiving an affirmative answer from appellant to its question as to whether he was an addict. *Amicus* has urged upon us the claim that the statutory classification of ineligibility founded upon two prior felony convictions is, at least as applied to appellant, so wanting in rationality as to constitute a denial of equal protection.

The provisions of the Narcotic Addict Rehabilitation Act of 1966 are prefaced by a declaration that it is

> [T]he policy of the Congress that certain persons charged with or convicted of violating Federal criminal laws, who are determined to be addicted to narcotic drugs, and likely to be rehabilitated through treatment, should, in lieu of prosecution or sentencing, be civilly committed for confinement and treatment designed to effect their restoration to health, and return to society as useful members.

This policy is then sought to be implemented by a scheme of noncriminal treatment which is available not only to those charged with federal offenses but also to those who have been tried and found guilty. Provision is also made for those who voluntarily seek commitment for treatment, although they are neither charged with, nor convicted of, criminal offenses.

Title II of the Act is addressed to the convicted offender awaiting sentence. It defines an addict as one "who habitually uses any narcotic drug * * * so as to endanger the public morals, health, safety, or welfare, or who is or has been so far addicted to the use of such narcotic drugs as to have lost the power of self-control with reference to his addiction." If the court believes that a defendant before it who has just been convicted of a federal offense is an addict, it may, in lieu of criminal sentencing, place him in the custody of the Attorney General "for an examination to determine whether he is an addict and is likely to be rehabilitated through treatment. * * * " If, following such examination, the court makes a finding of addiction and likelihood of rehabilitation through treatment, it shall commit the defendant to the custody of the Attorney General for treatment, unless the latter shall certify that adequate treatment facilities are not available. This commitment is for an indeterminate period not to exceed ten years or the maximum sentence for the offense of which the defendant was convicted.

A defendant so committed may, after at least six months of treatment in an institution maintained or approved by the Attorney General, thereafter be conditionally released in the discretion of the Parole Board upon a report of the Attorney General and certification by the Surgeon General that he "has made sufficient progress to warrant his conditional release under supervision." A defendant so released continues under the jurisdiction of the Parole Board and in the legal custody of the Attorney General, who "may contract with any appropriate public or private agency or any person for supervisory aftercare."

Appellant, although unquestionably an "addict" as defined in Title II, was not an "eligible offender" as prescribed in that statute. A convicted person eligible for disposition under Title II is first broadly defined as "any individual convicted of an offense against the United States," but this is followed by five exclusions. The first is for an offender convicted of a crime of violence. The second is for one "convicted of unlawfully importing or selling or conspiring to import or sell a narcotic drug, unless the court determines that such sale was for the primary purpose of enabling the offender to obtain a narcotic drug which he requires for his personal use because of his addiction to such drug." The third is for one against whom there is pending a prior charge of a felony which has not been finally determined or who is on probation or whose sentence following conviction on such a charge, including any time on parole or mandatory release, has not been fully served. The

fourth is for an offender "who has been convicted of a felony on two or more prior occasions." The fifth is for one who has been given noncriminal commitments under Title I, the D.C.Code, or any state law, on three or more prior occasions.

It is the fourth of these exclusions which was thought, by reason of the two prior federal narcotics offenses reported in the sentencing information, to bar appellant from being a candidate for disposition under Title II. The Narcotic Addict Rehabilitation Act of 1966 had its source in the report of the President's Advisory Commission on Narcotic and Drug Abuse, rendered in November, 1963, by a distinguished group of experts under the chairmanship of our beloved senior colleague, E. Barrett Prettyman. The statute envisioned in · that report did not contemplate any disqualification resting upon two prior felony convictions, and it would appear from the stated purposes of the report that any such disqualification so broadly conceived would be in hopeless conflict with the findings and recommendations of the Commission.[12]

■ Although presumably it could be said that appellant also came under the second exclusion because, theoretically at least, he was convicted of the act of selling, it is clear that this was not in fact the operative disqualification, since that exclusion would have necessitated an inquiry into whether appellant was selling to support his habit. This second exclusion is, in any event, highly relevant, because it creates the anomaly that an addict who has demonstrably engaged in trafficking may be eligible for noncriminal disposition under Title II, whereas a non-trafficking addict found, for the third time, in possession of narcotics for his own use may not. This is curiously at odds with the Congressional preoccupation, underlying the Narcotic Addict Rehabilitation Act, with the distinction between traffickers and non-traffickers, and the reiterated purpose that "strict punishment * * * be meted out where required to the hardened criminal, while justice * * be tempered with judgment and fairness in those cases where it is to the best interest of society and the individual that such a course be followed." H.R. Rep.No.1486, 89th Cong., 2d Sess., p. 9, U.S.Code Cong. & Admin.News 1966, p. 4250; *see also* S.Rep.No.1667, 89th Cong., 2d Sess., p. 17.

An addict who, at the time the 1966 Act became law, did not have two prior convictions is not disqualified from disposition under the new and enlightened provisions of the Narcotic Addict Rehabilitation Act.[13] Contrarily, one who,

12. The Senate and House versions of the Act differed on this exclusion from eligibility of those having two prior felony convictions, with the Senate enactment having no such provision. There were many expressions on the Senate floor as to the undesirability of excluding from the rehabilitative reach of the bill the large class of addicts who would have two prior convictions. The House bill prevailed on this point in conference. The conference report says only that the Senate conferees "felt it reasonable to exclude hardened offenders with serious criminal records. * * *"

Both House and Senate were initially in accord on the exclusion of an offender convicted of a crime of violence. The two-prior-felony exclusion is not, however, limited to convictions for crimes involving violence. Thus, an addict having two prior felony convictions for securities fraud would not be eligible for disposition under the Act. When this provision was criticized on the House floor as likely to "exclude from coverage precisely those addicts who most need medical treatment and rehabilitation services," a defender, who later served on the conference committee, said that the Act was designed to help "the narcotic addict who is secondarily guilty of some sort of minor or *nonviolent* offense." (Emphasis supplied.) Upon this rationale, it appears utterly illogical, in terms of the Act's purposes, not to restrict, at the least, the exclusion to prior crimes involving violence.

13. It is true, of course, that an addict in this category will, upon a subsequent second felony conviction, become ineligible under the terms of the Act. But this

like appellant, suffered criminal narcotics convictions on two occasions before 1966, is denied the rehabilitative possibilities of the new approach. Certainly when those two prior convictions are possible upon a mere showing by the Government of an addict in possession, we think the discrimination between the two classes of addicts is constitutionally unacceptable. As the Supreme Court has said in another, but not entirely irrelevant, context:

> Equal protection does not require that all persons be dealt with identically, but it does require that a distinction made have some relevance to the purpose for which the classification is made.[14]

Even if appellant's two prior narcotics convictions may be found to have involved actual proof of selling, and even if it be assumed that he was engaged in selling to support his habit contemporaneously with his present offense, the result we reach on this score is the same, involving, as it does, not the issue of his amenability to criminal prosecution but only his eligibility, after such prosecution and conviction, to be considered by the sentencing judge for possible disposition under Title II.[15] And, although it is true that no explicit challenge was made in the District Court to the assumption that appellant was ineligible for such consideration, we think it ap-

propriate to deal with the issue as raised in this court. Our holding in this regard does not turn on any disputed or obscured matters of fact requiring resolution or inquiry in the first instance by the trial court. Appellant was conceded to be a narcotics addict of long standing; and this is the only fact crucial to our holding. His eligibility would have been patent but for the two prior convictions—and those were convictions for federal narcotics offenses under the same statutes involved in this appeal. We hold only that the two-prior-felony disqualifying exclusion of Title II, as applied to appellant on these facts, is unconstitutional under the concept of equal protection embodied in the Due Process Clause of the Fifth Amendment.

Accordingly, we affirm the conviction, but vacate the sentence and remand the case for resentencing, in the course of which the District Judge shall give consideration to the disposition of appellant under Title II of the Narcotic Addict Rehabilitation Act.

It is so ordered.

J. SKELLY WRIGHT, Circuit Judge (concurring).

I agree with Judge Bazelon that the logic of today's opinion leads clearly to the conclusion that the federal narcotics laws involved in this case do not

---

overlooks the fact that his chances of never having that second conviction are markedly enhanced by his eligibility, prior to prosecution, for rehabilitative commitment under Title I of the Act. And even in the unlikely event that a second felony conviction should eventuate after 1966, it is by no means clear that to treat it as disqualifying an addict for noncriminal rehabilitative commitment would constitute a defensible classification in relation to the purposes of the Act. On the record before us we are not confronted with these hypothetical cases or others that could be envisaged; and, accordingly, we do not anticipate their disposition.

14. Baxstrom v. Herold, 383 U.S. 107, 111, 86 S.Ct. 760, 15 L.Ed.2d 620 (1966); *and see* Bolton v. Harris, 130 U.S.App. D.C. 1, 395 F.2d 642 (1968).

15. One court has regarded the advent of the Narcotic Addict Rehabilitation Act as a reason why great caution should be exhibited in undertaking "extension of *Robinson* beyond a line expressly drawn by the Supreme Court, especially when Congress has carefully contrived a procedure for dealing with this grievous social problem." Bailey v. United States, 386 F.2d 1, 4 (5th Cir. 1967). Although the Act cannot be a final solvent of some of the claims not irrationally rooted in *Robinson*, it is true that, as *amicus* says in its brief, "the problem in this case would in large measure be obviated if appellant could be treated under the Narcotic Addict Rehabilitation Act, from which he is excluded as a twice previously convicted offender."

apply to nontrafficking narcotics addicts in possession only of narcotics for their own use. Since, however, all of appellant's contentions save that regarding the insanity defense will be available to him on collateral attack, I join in Judge McGowan's opinion because of the additional contributions it makes toward the resolution of the problem of treating drug addiction in a criminal context.

BAZELON, Chief Judge (concurring in part and dissenting in part):

The majority opinion, it seems to me, stands for the proposition that when the issue is next before us, we will be compelled to hold that those provisions of the federal narcotics laws involved in this case do not apply to a narcotics addict, not trafficking in narcotics, who has purchased or otherwise received narcotics not in the original stamped package,[1] who has imported narcotics contrary to law,[2] or who has received, concealed, purchased, or facilitated the transportation or concealment of narcotics imported contrary to law,[3] so long as the narcotics involved are for the addict's own use.[4] Likewise, today's decision would appear to compel the conclusion that, when these acts are engaged in even by an addict who trafficks in narcotics, Robinson v. California[5] makes unavailing any attempt to apply these statutes to him.[6] The majority, however, refuses to apply these conclusions to appellant on his present appeal, because his court-appointed counsel did not, in its view, adequately raise the matter below. For like reasons it refuses to pass on his suggestion that we undertake in the present case a reformulation of the insanity defense, in light of *Robinson* and Powell v. Texas,[7] to take into account the special problems of that defense when a narcotics addict is prosecuted for unlawfully obtaining the narcotics necessary to support his habit. Finally, the majority concludes that the Narcotic Addict Rehabilitation

1. 26 U.S.C. § 4704(a) (1964) forbids the purchase, sale, distribution, or dispensing of narcotics not in the original stamped package. The reasoning of the majority opinion would not seem to apply to the sale, distribution, or dispensing of such drugs.

2. 21 U.S.C. § 174 (1964).

3. 21 U.S.C. § 174 (1964) also forbids the sale, or facilitation of sale, of narcotics imported contrary *to law if the act is* carried out with knowledge of the drugs' illegal importation. Again, I do not read the majority opinion as applying directly to such acts, even if committed by a nontrafficking addict.

4. The majority opinion, *see* p. 443 *supra,* states its conclusion in the alternative: "So it is that, if *Robinson's* deployment of the Eighth Amendment as a barrier to California's making addiction a crime means anything, it must also mean in all logic that (1) Congress either did not intend to expose the non-trafficking addict possessor to criminal punishment, or (2) its effort to do so is as unavailing constitutionally as that of the California legislature." It appears to me, however, that the majority's recognition of a substantial constitutional problem if the statutes are applied to nontrafficking addicts in the circumstances set forth in the text above would compel a construction of the statute that would avoid these constitutional problems. Watts v. United States, 394 U.S. 705, 707–708, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969); United States v. Rumely, 345 U.S. 41, 45–48, 73 S.Ct. 543, 97 L.Ed. 770 (1953); Ashwander v. TVA, 297 U.S. 288, 348, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring); Lucas v. Alexander, 279 U.S. 573, 577, 49 S.Ct. 426, 73 L.Ed. 851 (1929).

5. 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962).

6. So long as the narcotics involved in the offense charged are those intended by the addict for his own personal use, I can see no way that the applicability of *Robinson* v. *California* can be thought to turn upon whether the addict is also engaged in trafficking. Of course, the majority opinion does not seem to me to preclude application of these statutes to the sale of narcotics whether or not the seller is also addicted.

7. 392 U.S. 514, 88 S.Ct. 2145, 20 L.Ed.2d 1254 (1968).

Act of 1966 [8] is unconstitutional insofar as it seeks to deny consideration for rehabilitative disposition under the Act to addicts twice convicted of the importation or sale of narcotics prior to the passage of the Act.[9]

I concur in that holding, as set forth in Part IV of today's majority opinion. For the reasons hereafter set forth, however, I believe that this case is an appropriate vehicle for reexamination by the court *en banc* of the relationship between drug addiction and our developing doctrine of criminal responsibility. Unless the case may be disposed of on such a basis, however, I think we are compelled to conclude that appellant has adequately raised his claims that the government did not properly bring him within the reach of the statute; or that, if it did, the Constitution precludes his conviction on the present record. On this ground, accordingly, I would apply the majority's reasoning today to appellant and remand this case to the District Court with instructions to enter judgments of acquittal.

## I.

Writing for four members of the Court in Powell v. Texas,[10] Mr. Justice Marshall emphasized that the

> doctrines of actus reus, mens rea, insanity, mistake, justification and duress have historically provided the tools for a constantly shifting adjustment of the tension between the evolving aims of the criminal law and changing religious, moral, philosophical, and medical views of the nature of man.

392 U.S. at 536, 88 S.Ct. at 2156. Four other Justices in that case would have

reversed Powell's conviction for public intoxication on Eighth Amendment grounds.[11] But no member of that Court expressed the slightest disagreement with what I had thought to be the self-evident proposition that the Eighth Amendment's proscription of cruel and unusual punishments should provide the floor rather than the ceiling for the development of doctrines of criminal responsibility. In my view, *Powell* should be read not as a bar, but as an exhortation toward further experiment with common-law doctrines of criminal responsibility.

The suggestion that this case would be an appropriate vehicle for reexamination of our tests of criminal responsibility in the context of a narcotics addict charged only with obtaining narcotics for his own use was made for the first time in the brief *amicus curiae* filed just prior to our rehearing this case *en banc*. The majority rejects the suggestion primarily because it finds "problems in this approach to the extent that it is derived, *as it largely purports to be,* from the Eighth Amendment." (emphasis added). I have already indicated why I believe that the teaching of *Powell* is that the standards of accountability for criminal conduct should be developed, in the main, independently of the Eighth Amendment. And nowhere in the argument of *amicus*, urging upon us a modified test of criminal responsibility, do I find the suggestion that such a test must be derived from the Eighth Amendment. Rather, *amicus* would have us derive such a test from traditional doctrines of duress and involuntary actions. *See* Brief Amicus Curiae at 30–40.[12] Accordingly, the majority in this

---

8. 18 U.S.C. §§ 4251–4255 (Supp. IV, 1969).

9. I do not mean to imply by this statement that the majority's holding may not have a broader reach, a question upon which I express no opinion.

10. 392 U.S. 514, 88 S.Ct. 2145, 20 L.Ed. 2d 1254 (1968).

11. *Id.* at 554–570, 88 S.Ct. 2145, 2173. Mr. Justice White concurred in the re-

sult on the narrow ground that Powell had not shown that his alcoholism compelled him to be intoxicated *in public*.

12. *Amicus* relied in his argument solely on clinical materials and traditional doctrines of *mens rea*, insanity and duress as set forth in cases and in R. Perkins, Criminal Law 951–960 (2d ed. 1969).

case is rejecting not the argument of *amicus,* but merely a straw man of its own devising.

Nor can I say with anything approaching the necessary confidence that our insanity defense, under *Durham* [13] and *McDonald,*[14] provides a satisfactory solution.[15] Narcotics addiction, of course, may be symptomatic of an underlying mental illness that will relieve the actor of criminal responsibility for the crime charged.[16] Continued addiction may itself result in a deterioration of mental processes of such magnitude that the actor's conduct will be removed from the sphere of criminal liability.[17] In either of these situations, it may well be that the *Durham-McDonald* instructions adequately present the question to the jury. But our cases have also indicated that physical addiction may engender in the addict a compulsion to use drugs sufficient to override behavioral controls that could otherwise allow the addict to exercise a meaningful choice to refrain from the use of narcotics.[18] The *Durham-McDonald* instructions, with their emphasis on mental illness, are not in my view adequate to present this last defense—a defense of physical compulsion—to the jury. Nor do I find traditional doctrines of duress, under which this defense is presently subsumed,[19] a satisfactory remedy. To begin with, depending as it must on medical and psychiatric testimony, such a defense is far closer to the defense of insanity than is a defense of duress based upon external physical compulsion. Furthermore, acquittal on traditional grounds of duress would deny the trial court power to order a mental examination to test his present sanity, a power it possesses following acquittal by reason of insanity and which I believe it should possess when acquittal is grounded on an overwhelming compulsion to use drugs. Accordingly, I would undertake an *en banc* examination of the insanity defense in contexts such as this one to determine whether modifications should be made to cover such situations.[20]

Finally, I do not believe that we may fairly pass over this issue by reliance upon the failure of appellant's counsel to request specific instructions below.[21]

13. Durham v. United States, 94 U.S.App. D.C. 228, 214 F.2d 862 (1954).

14. McDonald v. United States, 114 U.S. App.D.C. 120, 312 F.2d 847 (1962) (*en banc*).

15. *See* United States v. Carter, 141 U.S. App.D.C. ——, —— – ——, 439 F.2d 436, 200–203 (decided June 5, 1970) (Bazelon, C. J., concurring).

16. Gaskins v. United States, 133 U.S.App. D.C. 288, 410 F.2d 987 (1967) ; Brown v. United States, 118 U.S.App.D.C. 76, 331 F.2d 822 (1964). *Gaskins* contains a comprehensive review of our cases to the date of its decision.

17. *See* Hansford v. United States, 124 U.S. App.D.C. 387, 389, 365 F.2d 920, 922 (1966).

18. We have referred to this as the defense of "pharmacological duress." Castle v. United States, 120 U.S.App.D.C. 398, 400–401, 347 F.2d 492, 494–495, cert. denied, 381 U.S. 929, 953, 85 S.Ct. 1568, 14 L.Ed.2d 687 (1965).

In the present case, Dr. Platkin, a psychiatrist from Saint Elizabeths Hospital testifying for the government on rebuttal, said that the "physical need for [narcotics] becomes overwhelming," tr. 300, and characterized appellant as "a man who has to be running all the time to keep up with his need for narcotics." Nevertheless, he said, "there was nothing that would lead me to conclude that he was mentally ill."

19. *See* Castle v. United States, note 18 *supra.*

20. In view of the majority's disposition of this question, I have not undertaken to determine the precise formulation that might be advisable. *Compare* United States v. Carter, *supra* note 15.

21. Counsel did, however, move for acquittal at the close of the government's case and again before the case was submitted to the jury, the latter time on the grounds that the government had not proved its case, had not sufficiently rebutted the evidence of insanity, and "on constitutional grounds in view of the decision in the Robinson case that it would be improper to criminally incarcerate an addict for his addiction." Tr. 44, 318–20.

Appellant, an indigent, was represented at trial by two attorneys specializing in patent law. When the trial began, one of them addressed the court as follows:

> Your Honor, at this time I would like to point out that Mr. _____ and myself are patent lawyers and we are relatively unfamiliar with criminal procedure. I apologize in advance for any procedural errors we may commit in this courtroom.

Tr. 9. Confirmation was not long in coming. Chief counsel had barely begun his opening statement when the trial court found it necessary to advise him that the "opening statement is supposed to indicate what you expect the evidence will show."[22] Aside from failing to raise the defense of physiological duress, despite the fact that even the psychiatrist testifying for the government had characterized their client as "a man who has to be running all the time to keep up with his ["overwhelming"] need for narcotics,"[23] counsel allowed the prosecutor to grossly misstate the law in his closing argument.[24]

I have nothing but praise for the character and dedication of appellant's counsel at trial. Criminal trial litigation is a difficult and specialized line of practice in general, and the problems of presenting an adequate insanity defense are notorious.[25] Doubtless as a result of substantial intelligence and diligent labor, appellant's trial counsel avoided many pitfalls and presented the jury with a far better picture of their client's mental state than is often the case. But "every prosecution of an accused is unique on the facts and the law, and makes its unique demands on the skills and character of the defense attorney."[26] I have no doubt of trial counsel's high character. The obvious effort with which they prepared for this case, representing an indigent defendant, is ample evidence of that. But the short of the matter is that they were novices, forced out beyond their depth in a complex field of law. Failure to insist on proper instructions with regard to appellant's addiction was not the sort of strategic choice which must often be made and which, once made, must be followed for good or ill. It amounted rather to abandonment of appellant's strongest ground for acquittal by reason of insanity. I would reach the question presented and, if warranted, remand for a new trial under proper instructions.

### II.

The majority concludes that we do not have before us "the kind of record upon which either the trial or appellate court can confidently adjudicate a serious issue of statutory construction with constitutional implications."[27] Appellant, the majority believes, should have "clearly and unequivocally" made his contentions to the trial court "to the end that a record can be made of the facts upon which they rest."[28] His court-appoint-

22. Tr. 16.

23. *See* note 18 *supra.*

24. After telling the jury he could understand their sympathizing with the plight of a man whose addiction, arising initially from drugs administered in a hospital, compelled him to use narcotics, the prosecutor told them that "sympathy has no place in a criminal case, ladies and gentlemen, with respect to determining your verdict. In the event of a conviction Her Honor will take into consideration all the various facets with respect to imposition of sentence and that is the Court's function." Tr. 330. Upon conviction, of course, appellant was sentenced to a mandatory minimum term of ten years in prison.

25. *See, e. g.,* Heard v. United States, 121 U.S.App.D.C. 37, 45, 348 F.2d 43, 51 (1965) (statement of Bazelon, C. J.); Jackson v. United States, 118 U.S.App. D.C. 341, 343–347, 336 F.2d 579, 581– 585 (1965) (Bazelon, C. J., concurring and dissenting).

26. A. Amsterdam, B. Segal, & M. Miller, Trial Manual for the Defense of Criminal Cases § 3, at p. 2–2 (1967).

27. *Ante,* at 453. *But compare* the panel opinions in this case reproduced as an Appendix to this opinion.

28. *Ante* at 453.

ed patent attorneys, in short, should have divined the procedure the majority sets down "[f]or the future * * *. To the extent that [a defendant] wishes to assert that the statutes are not to be read as applicable to him, his primary attack should, as *amicus* suggests, be by a motion to dismiss." [29] Or if he wishes to "raise these matters as affirmative defenses at trial," he "presumably must bear the burden of going forward with evidence which places him in the category of an addict in possession of narcotics solely for his own use." [30] In either event, says the majority, the record upon which decision is to be based must include "fact-finding sufficiently close in point of time to the events in question as to assure its integrity." [31]

I find the majority's strictures completely unwarranted. Insofar as appellant's attack is to the sufficiency of the indictment under which he was tried, it is clear that, under the Federal Rules, the challenge is properly before us and we may not with propriety avoid decision. To the extent that appellant's arguments are regarded as affirmative defenses that must be raised at trial, the evidence introduced by him was certainly sufficient to raise an issue for jury consideration.[32] Finally, as to appellant's constitutional claims, we do not sit as triers of fact. Appellant was entitled to have his case presented to the jury under a constitutional construction of the statutes under which he was tried. We may not avoid deciding whether or not the statute was constitutionally construed by the trial court simply by speculating that, in any event, the jury might have resolved the factual issues against appellant.

*First.* I am unable to discern the grounds upon which the majority refuses to decide appellant's challenge to the sufficiency of the indictment. The Federal Rules expressly provide that "the failure of the indictment or information to charge an offense shall be noticed by the court at any time during the pendency of the proceeding." Fed.R.Crim.P. 12(b) (2). Specifically, such a claim may be raised for the first time on appeal, Walker v. United States, 342 F.2d 22 (5th Cir.), cert. denied, 382 U.S. 859, 86 S.Ct. 117, 15 L.Ed. 97 (1965); [33] it may be raised for the first time on a petition for rehearing in the appellate court, Hotch v. United States, 208 F.2d 244 (9th Cir. 1953); or it may be raised for the first time on collateral attack, Marteney v. United States, 216 F.2d 760 (10th Cir. 1954). Nor may a defective factual record justify refusal to decide the question presented, for it is hornbook law that a motion to dismiss for failure to charge an offense tests only the sufficiency of the indictment on its face. *See, e. g.,* Hagner v. United States, 285 U.S. 427, 52 S.Ct. 417, 76 L.Ed. 861 (1932). Accordingly, the question of the sufficiency of the indictment is properly before us and we may not refuse to decide it.

29. *Ante,* at 453. It should be pointed out that *amicus* never suggested that such a prospective ruling should be invoked to bar appellant from having his claims considered.

30. *Id.* 454.

31. *Id.* 454.

32. The government, at trial, introduced not a scintilla of evidence to indicate that appellant was a trafficker in drugs. The majority, however, concludes that appellant did not "exclude or negate" the possibility that the heroin in his possession might have been available for sale. In so doing it relies solely upon the statement of an unknown informer, as reproduced in an affidavit in support of a search warrant introduced for the first time on appeal in this case. Appellant has had no opportunity to challenge the unknown individual who made the statement, and his own motions for a remand for further factfinding have been denied. *Compare* California v. Green, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970); Goldberg v. Kelly, 397 U.S. 254, 267–270, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1969).

33. *Accord, e. g.,* United States v. Manuszak, 234 F.2d 421 (3d Cir. 1956); Finn v. United States, 256 F.2d 304 (4th Cir. 1958); Carlson v. United States, 296 F. 2d 909 (9th Cir. 1961).

*Second.* The majority notes that defendants who wish to raise, as affirmative defenses at trial, the argument that their status as nontrafficking addicts in possession of narcotics solely for their own use removes them from the reach of the statute "presumably must bear the burden of going forward with evidence which places [them] in [this] category." [34] It completely fails, however, to explain in what way appellant failed to meet this burden. Testimony at trial from both of the psychiatrists who testified was that, at the time of the offense, appellant was addicted to narcotics with a daily habit of roughly 25 capsules of heroin. Dr. Platkin, who testified for the government, seemed to be as convinced of this as was Dr. Baughman, who testified for the defense. The only narcotics with receipt and concealment of which appellant was charged were 13 capsules of heroin, or slightly over half his daily requirements. The government's case raised not the slightest hint that appellant possessed these capsules in order to sell them, and indeed the prosecutor's closing argument admitted as much.[35] Conceivably, on such a record we might conclude that the jury was not compelled to find for appellant, and that it could permissibly believe, beyond a reasonable doubt, that appellant was not addicted. But the majority opinion does not rest upon such a conclusion. Rather, it appears to hold that appellant had not met his burden of coming forward with evidence to show that he was addicted to narcotics and that there was at least a reasonable doubt that the narcotics found in his possession were other than for his own use. Accordingly, it refuses to decide whether such a defense, if raised, would be valid. I believe that appellant has met the burden of coming forward with evidence to establish an affirmative defense, and that if such a defense is valid he should receive the benefit of it.

*Third.* With respect to the constitutional issue, we do not sit as triers of fact. Appellant was entitled to have the case submitted to the jury under instructions presenting a constitutional construction of the statutes under which he was tried.[36] The present case is not like Powell v. Texas,[37] which was tried to a court sitting without a jury and where, in consequence, issues of law were not preserved by a charge to the jury;[38] it is not like United Public Workers v. Mitchell,[39] an anticipatory attack on a statute, where judicial discretion may fairly impose a stricter burden of coming forth with evidence to present a constitutional claim; nor is it like Morales v. New York,[40] where the constitutional claim presented involved issues not normally tried to a jury.[41] Appellant's trial counsel did present his constitutional claim to the trial court, by specifically moving at the close of all the evidence for a judgment of acquittal on the ground that Robinson v. California[42] precluded his client's conviction.

34. *Ante*, at 454.

35. *See also* note 24, *supra*.

36. *See, e. g.,* Watts v. United States, 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969); Yates v. United States, 354 U.S. 298, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957).

37. 392 U.S. 514, 88 S.Ct. 2145, 20 L.Ed. 2d 1254 (1968).

38. *Powell*, of course, did include purported "findings of fact" by the trial court; but as the majority opinion noted, they were hardly supported by the evidence. *See* 392 U.S. at 521–522, 88 S.Ct. 2145. If the majority's conclusion that the factual record in this case is inadequate because of the *government's* failure to contest appellant's addiction, affirmance of the conviction is hardly the proper remedy.

39. 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947).

40. 396 U.S. 102, 90 S.Ct. 291, 24 L.Ed.2d 299 (1969).

41. In any event, the Court in *Morales* did not affirm the conviction there at issue, but remanded for further findings.

42. 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962).

I believe that this adequately raised the constitutional claim.[43]

### III.

No one involved with this case has expressed satisfaction with the narcotics laws as applied to persons such as appellant. In the court below, the prosecuting attorney told the jury that

> I don't like that law, I don't think there should be a law that governs narcotics and, particularly, narcotic addicts. * * * I don't like a law which governs narcotic addicts and says that a narcotic addict, if found in possession, can be charged and brought before a jury.

Tr. 337–338. I agree with the prosecutor; and so, apparently, does the majority. But the government, which addicted appellant to opiates in the first place, also provided him with counsel at trial whose admitted abilities in the field of patent law did not permit them to raise appellant's statutory and constitutional claim in the manner the majority deems proper. Accordingly, the majority refuses to give appellant the benefit of his admittedly meritorious claims. I have already indicated the reasons that I believe these claims are properly before us. But even if I did not, I would not force this indigent addict to suffer for the mistakes of his court-appointed counsel. I would reverse appellant's convictions.

---

43. See text accompanying notes 21–26 *supra.* Of course, the constitutional claim may, since this court refuses to rule on it, now be raised by collateral attack. Kaufman v. United States, 394 U.S. 217, 89 S.Ct. 1068, 22 L.Ed.2d 227 (1969); Rollerson v. United States, 394 U.S. 575, 89 S.Ct. 1300, 22 L.Ed.2d 557 (1969), reversing 132 U.S.App.D.C. 10, 405 F.2d 1078 (1968). Furthermore, the majority opinion, by refusing to rule on appellant's strongest defenses because it finds that they were not properly raised by his counsel, appears to have established as a matter of law that appellant was denied effective assistance of counsel under the

### APPENDIX

Opinions issued December 13, 1968 and vacated on April 18, 1969 by the Court *en banc:*

Before BAZELON, Chief Judge, and McGOWAN and ROBINSON, Circuit Judges.

BAZELON, Chief Judge:

Appellant, a narcotic addict, was convicted of narcotics offenses[1] and sentenced to the statutory minimum ten years' imprisonment for narcotics recidivists.[2] The evidence showed that at the time of his arrest he was in possession of thirteen capsules containing heroin— half the amount of his habitual daily use. He invoked the insanity defense[3] and the eighth amendment's prohibition against cruel and unusual punishment.

At trial, Appellant called two staff members from Saint Elizabeths Hospital as defense witnesses. Dr. Baughman, a psychiatrist, testified that Appellant was a "schizoid personality" and a narcotic addict, that his addiction was the product of his mental illness, and that his possession of narcotics for his own use was a direct result of his addiction. Dr. Stammeyer, a clinical psychologist, diagnosed Appellant as a "paranoid personality" on the basis of extensive tests administered under his direction.

In rebuttal, the Government called Dr. Platkin, the physician in charge of the Maximum Security Division at Saint

---

standards prevailing in this Circuit. *See* Scott v. United States, 138 U.S.App.D.C. 339, 427 F.2d 609 (decided April 15, 1970).

1. 21 U.S.C. § 174, *infra* note 41; I.R.C. § 7237(d) (1954), 26 U.S.C. § 4704(a), *infra* note 40.

2. *Id.* Further relevant sentencing provisions are found in I.R.C. § 7237(d) (1954), 26 U.S.C. § 7237(d).

3. Durham v. United States, 94 U.S.App. D.C. 228, 241, 214 F.2d 862, 874–875, 45 A.L.R.2d 1430 (1954); McDonald v. United States, 114 U.S.App.D.C. 120, 124, 312 F.2d 847, 851 (1952) (en banc).

Elizabeths. He discussed at length the symptoms found by Dr. Baughman and concluded that, though somewhat withdrawn, Appellant was not mentally ill. He further testified that Appellant was a narcotic addict, that addiction entails both an "overwhelming" physical need and a psychological urge, that most addicts manage nonetheless to stay off drugs for some time, and that Appellant himself had been "off and on." Asked why, once off, an addict would go back to drugs, he compared the psychological craving to that experienced by a smoker trying to give up cigarettes: in both cases, the urge to go back is "extremely difficult" to resist.

## I

Appellant contends that the trial court should have directed a judgment of acquittal in his favor because the Government introduced no evidence to rebut his showing of mental illness. On the contrary, he says, Dr. Platkin's testimony conclusively establishes that his addiction "substantially affect[ed his] mental and emotional process and substantially impair[ed his] behavior controls."[4] Therefore Dr. Platkin's conclusion that he was not mentally ill must have rested on the medical—not the legal —definition of insanity.[5] And since it was undisputed that the thirteen capsules found by the police amounted to less than a day's supply, he maintains there was no evidence that his illegal possession was not the "product" of his addiction.[6]

■ Our cases make clear that the issue of criminal responsibility cannot be raised merely by evidence of narcotic addiction. That issue may arise if, but only if, the evidence shows that a particular addiction is such as to "substantially affect mental and emotional processes and substantially impair behavior controls."[7] Even where there is evidence of such an effect, however, the criminal responsibility of an individual addict under the *Durham-McDonald* rule would still present a jury question. Accordingly, Appellant was not entitled to a directed verdict.

■ The jury were properly instructed in substance that they were to acquit Appellant unless they found beyond a reasonable doubt that his offense was not the product of an "abnormal condition of the mind which substantially affects mental or emotional processes and substantially impairs behavioral controls."[8] The trial court did not say specifically that Appellant's addiction could be such an abnormal mental condition. But Appellant requested no such instruction, nor did he argue that his addiction alone entitled him to an acquittal. In these circumstances, he understandably does not even now contend that the court erred in failing to instruct on addiction *sua sponte*.

■ He does complain that in summarizing the evidence on the insanity issue, the trial court misled the jury by citing Dr. Platkin's statement that appellant was not mentally ill without also mentioning his testimony concerning appellant's addiction. But the omission was misleading only to the extent that the diagnosis of addiction contradicted or qualified the conclusion of no mental

---

4. McDonald v. United States, *supra* note 3, at 124, 312 F.2d at 851.

5. See *id.* at 123–124, 312 F.2d at 850–851; Washington v. United States, 129 U.S. App.D.C. 29, 31, 390 F.2d 444, 446 (decided December 13, 1967).

6. Durham v. United States, *supra* note 3.

7. See Castle v. United States, 120 U.S. App.D.C. 398, 400, 347 F.2d 492, 494, cert. denied, 381 U.S. 929, 953, 85 S.Ct. 1568, 1811, 14 L.Ed.2d 687, 726, reh.

denied, 382 U.S. 874, 86 S.Ct. 13, 15 L.Ed.2d 116 (1965); Heard v. United States, 121 U.S.App.D.C. 37, 348 F.2d 43 (1965); Green v. United States, 127 U.S.App.D.C. 272, 383 F.2d 199 (1967), cert. denied, 390 U.S. 961, 88 S.Ct. 1061, 19 L.Ed.2d 1158 (1968); Gaskins v. United States, 133 U.S.App.D.C. 288, 410 F.2d 987 (decided December 20, 1967).

8. McDonald v. United States, *supra* note 3, at 124, 312 F.2d at 851.

illness. Since Dr. Platkin testified that it did not, and appellant did not argue that it did, we find no reversible error.

II .

Appellant also argues that it is cruel and unusual punishment under Robinson v. California,[9] either (a) to punish him at all, or (b) to sentence him to prison for an irreducible minimum term of ten years,[10] solely because he was in possession of drugs he needed to satisfy his addiction.

(a) Certainly filling the prisons with persons whose transgressions are largely, if not wholly, beyond their control is an unfortunate "solution" for any social ill. The sterility of the legislative scheme for dealing with the persistent problem of narcotic addiction is well illustrated by the apparent facts of this case. Appellant told Dr. Baughman that his addiction began in a U.S. Army hospital in Japan during his convalescence from wounds suffered in the Korean War. When the doctors took him off morphine, a Japanese nurse slipped him heroin to ease his pain. His addiction, of course, immediately brought him into conflict with the law upon his return to the United States, and he was twice convicted of narcotic violations. While on parole from the second conviction, he turned himself in to the parole officer and requested medical help to prevent him from "slipping." He was sent to the U.S. Public Health Service ·Hospital at Lexington, Kentucky, where he was kept for two years. After his release, he avoided drugs for nine months, during which he studied for the Baptist ministry. Then, evidently no longer able to abstain, he dropped out of school when he was on the verge of ordination and went back to narcotics. The congressional response to this tragic history is to order the victim out of sight and presumably out of mind for the next decade.

In *Robinson,*[11] the Court held that punishment for the disease of addiction violates the eighth amendment. At the same time it said in dictum that legislatures were free to punish addicts for possessing drugs.[12] The logic of this distinction was not transparent, but since the Supreme Court made it, we said only that Court should change it.[13]

Thereafter, however, in Powell v. Texas,[14] the Court spoke to the issue, albeit in muffled tones. *Powell* was a prosecution of an alcoholic for public drunkenness. The Court affirmed the conviction in three separate opinions. But a majority of the Justices were of the opinion that *Robinson* prohibits punishment of some conduct performed under the direct compulsion of a disease, as well as punishment of the status of being sick.[15] And Justice White, who cast the deciding vote for affirmance, specifically asserted that "unless *Robinson* is to be abandoned, the use of narcotics by an addict must be beyond the reach of the criminal law." He found no constitutional defect in Powell's conviction because nothing in the record supported the finding that Powell had a compulsion "to

9. 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962).

10. Under I.R.C. § 7237(d) (1954), 26 U.S.C. § 7237(d), a person convicted of either of Appellant's statutory offenses, see note 1, *supra,* is not entitled to either probation or parole.

11. *Supra,* note 9.

12. *Id.* at 665, 666, 667–668, 82 S.Ct. 1417.

13. Castle v. United States, *supra* note 7, 120 U.S.App.D.C. at 401, 347 F.2d at 495.

14. Powell v. Texas, 392 U.S. 514, 88 S.Ct. 2145, 20 L.Ed.2d 1254 (1968).

15. *Id.* (opinion of White, J., at 548 *et seq.,* 88 S.Ct. at 2162, dissenting opinion of Fortas, J., at 554 *et seq.,* 88 S.Ct. at 2165.) The four dissenting Justices found it "cruel and unusual" to punish an alcoholic "for a condition—being 'in a state of intoxication' in public—which is a characteristic part of the pattern of his disease and which the trial court found, was not the consequence of appellant's volition but of 'a compulsion symptomatic of the disease of chronic alcoholism.'" *Id.* at 558, 88 S.Ct. at 2167.

frequent public places when intoxicated." [16]

Thus, *Powell* does not preclude a holding that the eighth amendment prohibits punishing an addict for possessing narcotics exclusively for his own use. On the other hand, *Powell* does indicate that where a claim of cruel and unusual punishment rests wholly on the premise that the punished conduct was compelled by a disease, the claimant bears an unusually heavy burden of proof. Apparently, punishment is constitutionally barred only if there is clear and convincing evidence that the defendant was practically without "free will" to desist. [17]

■ In the instant case, it is undisputed that Appellant is an addict in the sense that he is unable to abstain permanently from the use of drugs. It is less clear, however, that he was an active, physically-addicted addict at the time of his offense. He was arrested on April 22, 1966, but his psychiatric examination did not occur until nine months later. He had been completely off narcotics in March, 1966, and the only evidence which suggests physical addiction in April is Dr. Baughman's statement:

> Well this is what he tells us, that is that he was on drugs at the time.
>
> \* \* \*

On cross-examination, Dr. Baughman testified that Appellant had "some freedom of choice" not to take drugs on April 22. Though that freedom was limited by the psychological pressure of his addiction, we cannot say with confidence that this record makes the clear showing of compulsion required, in the light of *Powell*, to bar any punishment whatever under the eighth amendment. [18]

(b) But Appellant says that even if his offense is punishable, it is "cruel and unusual" to imprison him "for the minimum statutory term of ten years, without the hope of probation or parole, and without regard to his dire need of treatment." [19] Thus, he suggests that the

---

16. *Id.* at 548–549, 88 S.Ct. at 2162.

17. *Cf.* the extended discussion in *Powell* of the difference between "loss of control" and "inability to abstain." *Id.* at 524–526, 88 S.Ct. at 2150. Justice Marshall concluded that

> It is one thing to say that if a man is deprived of alcohol his hands will begin to shake, he will suffer agonizing pains and ultimately he will have hallucinations; it is quite another to say that a man has a "compulsion" to take a drink, but that he also retains a certain amount of "free will" with which to resist. It is simply impossible, in the present state of our knowledge, to ascribe a useful meaning to the latter statement.

*Id.* at 526, 88 S.Ct. at 2151. Justice White's concurring opinion also makes clear that he would find an eighth amendment violation only where there was an "irresistible compulsion" to drink. *Id.* at 548, 549, 551, 88 S.Ct. at 2163 n. 3.

18. We also note Justice Marshall's admonition in *Powell* that the continually evolving common law doctrine of *mens rea*, not the eighth amendment, ought generally to govern the question of criminal responsibility. *Id.* at 533–537, 88 S.Ct. at 2154–2156. Thus, an addict charged with possession of narcotics may in an appropriate case raise an insanity defense, see note 7, *supra*, or a defense of "pharmacological duress," Castle v. United States, *supra* note 7, 120 U.S. App.D.C. at 400–401, 347 F.2d at 494–495; Hutcherson v. United States, 120 U.S.App.D.C. 274, 288, 345 F.2d 964, 978, cert. denied, 382 U.S. 894, 86 S.Ct. 188, 15 L.Ed.2d 151 (1965) (dissenting opinion of Bazelon, Ch. J.).

19. We have not previously confronted directly this particular challenge to the narcotics laws. Our opinion in Hutcherson v. United States, *supra* note 18, did appear to reject summarily an addict's claim that a ten-year sentence was cruel and unusual. However, it appears from the concurring and dissenting opinions that the argument rejected there was "not that the penalty inflicted is too harsh for the alleged crime. \* \* \* Rather it [was] \* \* \* that the acts could not constitutionally be considered a crime, subject to criminal punishment of any nature, when performed by a drug addict wholly because of his drug addiction." 120 U.S.App.D.C. at 287, 345 F.2d at 977 (dissenting opinion of Bazelon, Ch. J.); *id.* at 280, 345 F.2d at 970 (opinion of Burger, J.).

eighth amendment prohibits *excessive* punishment as well as bizarre forms of punishment and, in some cases, punishment itself.

This contention finds substantial support in Weems v. United States.[20] There, the Supreme Court struck down a sentence of 15 years imprisonment at "hard and painful labor" imposed under Philippine law for the offense of falsifying a public document to conceal a minor misuse of public funds.[21] That sentence for such an offense was deemed "cruel in its excess of imprisonment" as well as "unusual in its character," and was condemned "both on account of [its] * * degree and kind."[22]

The decision in *Weems* was undoubtedly influenced by the peculiar incidents of the challenged imprisonment: "a chain at the ankle and wrist of the offender, hard and painful labor, no assistance from friend or relative, no marital authority or parental rights or rights of property * * *."[23] But the Court did not find this mode of punishment forbidden as "inhuman and barbarous" under the eighth amendment.[24] Instead, it emphasized the relative triviality of the offense punished, especially in relation to other crimes which were punished less severely, and it combed the case law, both state and federal, for opinions that the eighth amendment

> was directed, not only against punishments which inflict torture, "but against all punishments which, by their excessive length or severity, are greatly disproportioned to the offenses charged."[25]

Though the Court has not had occasion to follow it, *Weems* "has generally been accepted by both federal and state courts as establishing the rule that excessiveness as well as mode of punishment may be unconstitutionally cruel."[26] In *Pow-*

Some other courts have, however, refused to find narcotic sentences unconstitutionally excessive under the eighth amendment. *E. g.*, Stewart v. United States, 325 F.2d 745 (8 Cir.), cert. denied, 377 U.S. 937, 84 S.Ct. 1344, 12 L.Ed.2d 301 (1964); Vera v. United States, 288 F.2d 25 (8 Cir. 1961), Gallego v. United States, 276 F.2d 914 (9 Cir. 1960); Lathem v. United States, 259 F.2d 393 (5 Cir. 1958). In none of the aforementioned cases was the Appellant shown to be an addict, and each is also distinguishable either by the length of the sentence or by the specific offense proved. In *Gallego*, the court appeared to concede that in some circumstances a *five* year sentence without probation and parole might be cruel and unusual punishment. 276 F.2d at 918. But it found no such circumstances in a prosecution for illegal importation of marijuana, which is not addicting and which was found on the appellant's person by a customs inspector at the border. United States ex rel. Swanson v. Reincke, 344 F.2d 260 (2 Cir. 1965), cert. denied, 382 U.S. 869, 86 S.Ct. 144, 15 L.Ed.2d 108, is more directly in point. But there an addict was sentenced to a term of 1½ to 4 years for self-administration of a drug under a statute providing for a maximum sentence of 5 years. The legislature had specifically authorized a lighter sentence for such cases than for other narcotic offenses. In these circumstances, Judge Friendly found the sentence and statute very different from those condemned in Weems v. United States, *infra* note 20. 344 F.2d at 264.

20. 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793 (1910).

21. The Court said the cruel and unusual punishment provision of the Philippine Bill of Rights, under which the case was argued, "was taken from the Constitution of the United States, and must have the same meaning." *Id.* at 367, 30 S.Ct. at 549. And the punishment imposed would have the same "bad attributes even if they were found in a Federal enactment and not taken from an alien source." *Id.* at 377, 30 S.Ct. at 553.

22. *Id.* at 377, 30 S.Ct. at 553.

23. *Id.* at 366, 30 S.Ct. at 548.

24. *Id.* at 368, 30 S.Ct. at 549.

25. *Id.* at 371, 30 S.Ct. at 551, quoting O'Neil v. Vermont, 144 U.S. 323, 339–340, 12 S.Ct. 693, 36 L.Ed. 450 (1892) (dissenting opinion of Mr. Justice Field).

26. Note, "The Cruel and Unusual Punishment Clause and the Substantive Criminal Law," 79 HARV.L.REV. 635, 640 (1966). See, *e. g.*, Workman v. Commonwealth, 429 S.W.2d 374 (Ky. 1968); State v. Evans, 73 Idaho 50, 245 P.2d

*ell* the Court cited it for the proposition that under the eighth amendment "the nature of the conduct made criminal is ordinarily relevant only to the fitness of the punishment imposed." [27] And in *Trop v. Dulles*,[28] the Court said the case shows that "the words of the Amendment are not precise, and that their scope is not static." "The basic concept underlying the Eighth Amendment," wrote Chief Justice Warren,

> is nothing less than the dignity of man. While the State has the power to punish, the Amendment stands to assure that this power be exercised within the limits of civilized standards. Fines, imprisonments, and even execution may be imposed *depending on the enormity of the crime * * *.* The Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society.[29]

In support of the holding in *Robinson*, Justice Douglas observed: "the principle that would deny power to exact capital punishment for a petty crime would also deny power to punish a person by fine or imprisonment for being sick." [30] Conversely, we think *Robinson* plainly severed the few strands in *Weems* which might have tied the eighth amendment exclusively to prohibiting uncivilized modes of punishment. Once it is established that the nature of the offense or the offender may affect the constitutionality of the punishment, we can perceive no good reason why this consideration should be relevant only where the conduct cannot be punished at all. We recognize that the seriousness of an offense and the necessary or appropriate amount of punishment are primarily matters for resolution by the legislature. But that is equally true of the question of what should be punished in the first place. The "evolving standards of decency that mark the progress of a maturing society," which underlie the eighth amendment,[31] are not readily confined within the artificial alternatives of impermissible mode of punishment or unpunishable offense.

■ In view of the wide scope that must be given to legislative discretion in the area of sentencing, relatively few sentences will be so severe in relation to the punished conduct as to offend the eighth amendment. But we think that two elements of the offense of possession of narcotics by an addict to satisfy his own needs render its punishment particularly vulnerable to constitutional scrutiny.

First, the Supreme Court has both recognized that narcotic addiction is a dis-

---

788 (1952); State v. Kimbrough, 212 S.C. 348, 46 S.E.2d 273 (1948). *See also* State v. Ross, 55 Or. 450, 104 P. 596, 42 L.R.A.,N.S., 601 (1909), modified 106 P. 1022, 42 L.R.A.,N.S., 613 (1910); State ex rel. Garvey v. Whitaker, 48 La.Ann. 527, 19 So. 457, 35 L.R.A. 561 (1896).

In State v. Evans, *supra*, the Idaho Supreme Court aptly summarized the case law as follows:

> Cruel and unusual punishment were originally regarded as referring to such barbarous impositions as pillory, burning at the stake, breaking on the wheel, drawing and quartering, and the like. But it is now generally recognized that imprisonment for such a length of time as to be out of all proportion to the offense committed, and such as to shock the conscience of reasonable men, is cruel and unusual within the meaning of the constitution.

245 P.2d at 792. So saying, the court proceeded to read a mandatory life sentence provision out of the statute punishing lewd and lascivious acts performed on a minor under the age of 16 with the intent of arousing or gratifying sexual desires. It said the statute would be unconstitutional if applied to the "acts of a more or less trivial nature [which] are within its broad terms." *Id.* at 793.

27. Powell v. Texas, *supra* note 14, 392 U.S. at 532, 88 S.Ct. at 2154.

28. 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958).

29. *Id.* at 100–101, 78 S.Ct. at 597–598 (emphasis added).

30. Robinson v. California, *supra* note 9, 370 U.S. at 676, 82 S.Ct. at 1425 (opinion of Douglas, J.).

31. Trop v. Dulles, *supra* note 29.

ease and held that the eighth amendment precludes punishment of that disease.[32] The use and incidental possession of narcotics are invariable symptoms of addiction. Even if an addict retains some minimal "free will" not to indulge at a particular moment in time, no one would deny that his use of narcotics is largely involuntary—indeed is the essence of his disease.[33] Thus, although some punishment of an addict's use may be permissible, the fine distinctions [34] and conflicting opinions in *Powell* show how close to the line of unconstitutionality any such punishment lies. Where the eighth amendment barely permits *any* punishment of an offense, it may reasonably be thought to set relatively strict limits on the amount of punishment which may be imposed.[35]

Second, mere possession of narcotics is not in itself a grave offense. Its principal victim is the possessor, and a severe jail sentence is hardly defensible as an act of benevolence toward him. But the public has a legitimate interest in controlling the traffic in narcotics. While absolute prohibition has not been a notably successful approach—indeed, it may well have made control more difficult—,[36] we do not say that prohibition of

32. Robinson v. California, *supra* note 9, 370 U.S. at 667 and n. 8, 82 S.Ct. 1417.

33. Congress itself has indicated dissatisfaction with punishing an addict for offenses entailed by his addiction in the Narcotic Addict Rehabilitation Act of 1966. 80 Stat. 1438 *et seq.* (1966). It authorized civil commitment in lieu of conviction for addicts charged, *inter alia*, with narcotic offenses not involving unlawful importation or sale. 80 Stat. at 1438–1439, 28 U.S.C. §§ 2901(g) (2), 2902 (Supp.1967). It also provided for sentencing convicted addicts to treatment, 80 Stat. at 1443, 18 U.S.C. § 4253 (Supp. 1967), subject to a similar exception for importers and peddlers; but here, the exception is itself subject to an exception permitting commitment where "the court determines that [the] * * * sale was for the primary purpose of enabling the offender to obtain a narcotic drug which he requires for his personal use because of his addiction to such drug." 80 Stat. at 1442, 18 U.S.C. § 4251(f) (2) (Supp.1967).

34. The Court opinion in *Powell* did not attempt to explain why, if the eighth amendment does not bar punishment of conduct compelled by a disease, it nonetheless prohibits punishment of the "status" of having the disease. Justice Marshall merely asserted that punishment for an alcoholic's *public* behavior "seems a far cry from convicting one for being an addict, a chronic alcoholic, being 'mentally ill or a leper * * *,'" 392 U.S. at 532, 88 S.Ct. at 2154, and relied heavily on the difficulties of determining when conduct is truly involuntary. Justice Black, concurring, did attempt to rationalize the line he drew between a status and behavior entailed by the status. He conceded that the reasons—other than the manifest injustice of punishing involuntary conduct—for *Robinson's* "refusal to permit conviction without proof of an act are difficult to spell out," but he found them "nonetheless perceived and universally expressed in our criminal law." He then cited the relative unreliability of evidence of a "propensity" to act rather than of an actual act, and the resultant danger of punishing mere evil thoughts or fantasies. *Id.* at 543–544, 88 S.Ct. at 2159–2160. He did not say how this rationale applied to preclude punishment of narcotic addiction. And ultimately he finished by emphasizing how hard it often is to say whether conduct was involuntary. *Id.* at 544, 88 S.Ct. at 2160.

35. Other courts have recognized that characteristics of the offender may affect the constitutionality of a severe sentence. The Kentucky Supreme Court recently invalidated a life sentence without eligibility for parole imposed for the crime of rape. The sentence could have been given an adult, the Court said, but as applied to a 14-year old boy it was cruel and unusual punishment. Workman v. Commonwealth, *supra* note 26. In State v. Kimbrough, *supra* note 26, the court found thirty years' imprisonment a constitutionally excessive punishment for burglary—"one of the worst crimes,—" because the facts showed "no particular circumstances of aggravation" and because the jury had recommended mercy. 46 S.E.2d at 277.

36. Prohibition of narcotics, like prohibition of alcoholic beverages, has created a black market which operates largely out of sight of public authority and often, because of its size and enormous profita-

use, possession, or purchase is a constitutionally unreasonable means to that end.[37] At the same time, we would be less willing to question Congress's prescribed measure of punishment if the sanctioned conduct more obviously or more directly threatened the life or limb or health or property of others.[38] Thus, a prosecution for "pushing" narcotics, which may cause others to become addicted, is likely to present a different case.[39]

In the instant case, these two elements which trigger eighth amendment scrutiny converge. Appellant is an addict. There is some indication that even his original, fatal contact with drugs may not have been culpable. Whether or not he was physically addicted at the time of his arrest to the point that deprivation of drugs induced withdrawal symptoms, his daily habit was said to be twenty-five capsules. He was convicted solely on evidence that he had in his possession thirteen capsules—a half-day's supply. In these circumstances we think his possession must be regarded as a symptom of his addiction.

■ It is true that technically appellant was not convicted of possession. Rather, the presumptions of the narcotics statutes converted his possession into sufficient proof that he illegally "purchased, sold, dispensed, and distributed" [40] (count 1) and "facilitated the concealment and sale" [41] (count 2) of a narcotic drug. Each of the relevant narcotic statutes [42] creates a single hydra-headed crime which may be committed either (1) under one of its specific heads, such as purchase, receipt, transportation, concealment, or sale, or (2) under its

---

bility, out of reach as well. Black marketeers also have a compelling material incentive to entrap the unwary into becoming addicts. See generally H. Howe, An Alternative Solution to the Narcotic Drug Problem, 22 LAW & CONTEMP. PROB. 132 (1957); A. LINDESMITH, THE ADDICT AND THE LAW, chs. 5 and 10 (1965).

37. *Cf.* Yee Hem v. United States, 268 U.S. 178, 183, 45 S.Ct. 470, 69 L.Ed. 904 (1925).

38. In *Weems, supra* note 20, the Court compared the defendant's crime with other harshly punished offenses and concluded, "In all such cases there is something more to give character and degree to the crimes than the seeking of a felonious gain, and it may properly become an element in the measure of their punishment." 217 U.S. at 380, 30 S.Ct. at 554. The falsification of a public document to conceal misuse of funds, it said, may "injure nobody." *Id.* at 365, 30 S.Ct. at 548. *See also* State *ex rel.* Garvey v. Whitaker, *supra* note 26, where a Louisiana court found unconstitutional excessive a sentence of six years in jail in the event of non-payment of a fine for 72 consecutive violations of an ordinance forbidding "destroying plants in public squares."

39. *Cf.* Gore v. United States, 357 U.S. 386, 78 S.Ct. 1280, 2 L.Ed.2d 1405 (1958); and Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), in which the Supreme Court upheld severe sentences for sale of narcotics.

40. 26 U.S.C. § 4704(a) provides:
It shall be unlawful for any person to purchase, sell, dispense, or distribute narcotic drugs except in the original stamped package or from the original stamped package; and the absence of appropriate tax paid stamps from narcotic drugs shall be prima facie evidence of a violation of this subsection by the person in whose possession the same may be found.

41. 21 U.S.C. § 174 provides:
Whoever fraudulently or knowingly imports or brings any narcotic drug into the United States or any territory under its control or jurisdiction, contrary to law, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment or sale of any such narcotic drug after being imported or brought in, knowing the same to have been imported or brought into the United States contrary to law * * *, shall be imprisoned not less than five or more than twenty years * * *.
Whenever on trial for a violation of this section the defendant is shown to have or to have had possession of the narcotic drug, such possession shall be deemed sufficient evidence to authorize conviction unless the defendant explains the possession to the satisfaction of the jury.

42. See notes 40 and 41 *supra*.

undifferentiated collective head, by unexplained possession. If, as here, the evidence shows only possession, the Government may charge all the prohibited acts (as it did in the first count) or only selected acts (as it did in the second); but whatever the charge, the presumption from possession proves only "a violation of [the] * * * section"—not the commission of any specific prohibited act.[43]

 Of course, anyone who possesses unstamped narcotics has almost certainly either bought or received them, and if he values his freedom he is undoubtedly also concealing them; these offenses are the necessary concomitants

(and are punished in order to prevent) possession and use. Thus, the presumption that a possessor has violated some part of each statute is not unreasonable.[44] But an addict's possession of a small amount of narcotics does not, without more, reasonably support a specific presumption that he possessed it for purposes of sale, much less that he actually sold it.[45] We are satisfied that Congress intended no such ill-founded presumption, but even if it did, we could hardly dispose of an eighth amendment question by concluding that the defendant's punishment was not excessive in relation to a crime which there was no persuasive evidence he had committed.

43. See, e. g., Bates v. United States, 95 U.S.App.D.C. 57, 219 F.2d 30, cert. denied, 349 U.S. 961, 75 S.Ct. 891, 99 L.Ed. 1283 (1955); United States v. White, 228 F.2d 832 (7 Cir. 1956).

In Yee Hem v. United States, supra note 37, in which the Supreme Court upheld the presumptions of 21 U.S.C. § 174, supra note 41, the defendant had been charged specifically with "concealing." But the Court did not concern itself with the specific act of concealment. Instead it said broadly:

Legitimate possession, unless for medicinal use, is so highly improbable that to say to any person who obtains the outlawed commodity, "since you are bound to know that it cannot be brought into this country at all, except under regulation for medicinal use, you must at your peril ascertain and be prepared to show the facts and circumstances which rebut, or tend to rebut, the natural inference of unlawful importation, or your knowledge of it," is not such an unreasonable requirement as to cause it to fall outside the constitutional power of Congress.

Id. 268 U.S. at 184, 45 S.Ct. at 471. Thus, the presumptions in the unlawful importation statute are essentially only that "the narcotics were imported contrary to law and * * * that the person in possession had knowledge of such unlawful importation." United States v. Feinberg, 123 F.2d 425, 427 (7 Cir. 1941); cert. denied, 318 U.S. 801, 62 S.Ct. 626, 86 L.Ed. 1201 (1942); cf. United States v. Moe Liss, 105 F.2d 144, 146 (2 Cir. 1939).

44. Thus, the Supreme Court has found "a rational connection" between proved possession and presumed purchase under the Harrison Act. (26 U.S.C. § 4704(a), supra note 40.) "In dealing with a poison not commonly used except upon a doctor's prescription easily proved or for a debauch only possible by a breach of law," the Court said, "it seems reasonable to call on a person possessing it in a form that warrants suspicion to show that he obtained it in a mode permitted by law." Casey v. United States, 276 U.S. 413, 418, 48 S.Ct. 373, 374, 72 L.Ed. 632 (1928).

45. Of course, the proposition recited in the indictment that appellant "sold" and "facilitated the * * * sale" of the narcotics found in his possession refutes itself. And though many addicts undoubtedly sell narcotics to support their habit, we can scarcely indulge in the presumption that anyone who possesses narcotics is or has been a seller. We find no case in which a court has said possession reasonably supports an inference of sale. In United States v. Santore, 290 F.2d 51, 59–61 (2 Cir. 1960), cert. denied, 365 U.S. 834, 81 S.Ct. 749, 752, 5 L.Ed. 2d 744 (1961), the court sustained a conviction for sale on the strength of the presumption arising from constructive possession of narcotics. But there the evidence showed there had been a sale, and the question was whether the appellant was sufficiently involved in the narcotic conspiracy to implicate him in the specific act of sale as well.

Undoubtedly, however, possession of a sufficiently large quantity of narcotics, even by an addict, can give rise to a reasonable inference that they are intended for sale.

In lieu of such evidence, the Government has on several occasions sought to assure us that it never brings a prosecution based on the statutory presumption from possession unless the defendant is in fact guilty of a substantially more serious crime, such as sale. Our task would be much easier if we could safely accept such assurances. But we cannot ignore the danger that, by error or design, mere possessors will be punished as sellers. In our system the responsibility for assaying the evidence of guilt is reposed in court and jury, not in the prosecutor. Especially where the penalty at stake is so harsh, the same policy which requires strict construction of criminal offenses prevents us from relying on prosecutorial good faith or on evidence which has not been submitted to the scrutiny of the adversary process.[46]

Ten years in prison is at least twice as long as the *maximum* federal sentence for such major felonies as extortion,[47] blackmail,[48] perjury,[49] assault with a dangerous weapon or by beating,[50] arson (not endangering human life),[51] threatening the life of the President,[52] and selling a man into slavery.[53] It is severe both in its length and in its callous disregard for appellant's obvious need for treatment [54]—which, if successful, would substantially serve all the possible legitimate purposes of punishing him.

But there are other indices of the severity of the sentence besides the absolute length of the prison term. Ten years is the minimum sentence authorized by Congress for a "subsequent" narcotic offender,[55] and Congress has rarely seen fit to fix minimum sentences. With the exceptions of such grave crimes as first degree murder [56] and treason,[57] the standard federal sentencing scheme sets a statutory maximum for the most egregious offender and assigns to the trial judge the task of determining what lesser sanction will serve the interests of society without unjustly penalizing the defendant. Thus, the imposition of a statutory minimum, denying the defendant the benefit of any special equity or mitigating circumstances which would otherwise result in a lighter sentence, is itself a mark of unusual severity. And we note that, at least on the record before us, this appellant has

---

46. In the instant case, we are referred to the search warrant issued for Appellant's apartment, in which the affiant cited information from a "reliable source" that Appellant was preparing and retailing heroin from his apartment. The warrant specified "heroin, syringes, tourniquets, cookers, and paraphernalia used in the preparation and disposition of heroin. * * *" In fact, the officers found only a very small quantity of heroin. We dare not treat such anonymous hearsay, untested by cross-examination, as proof of the matter asserted.

47. 18 U.S.C. § 872.

48. 18 U.S.C. § 873.

49. 18 U.S.C. § 1621.

50. 18 U.S.C. § 113(c) and (d). But see 18 U.S.C. § 111.

51. 18 U.S.C. § 81.

52. 18 U.S.C. § 871.

53. 18 U.S.C. § 1584.

54. The court recommended that Appellant be committed to the U. S. Public Health Service Hospital at Lexington, Kentucky, but he has instead been confined in the penal facilities of the District of Columbia.

55. "For a second or subsequent offense (as determined under section 7237(c) of the Internal Revenue Code of 1954), the offender shall be imprisoned not less than ten or more than forty years and, in addition, may be fined not more than $20,000." 21 U.S.C. § 174, *supra* note 41.

56. 18 U.S.C. § 1111. The minimum federal penalty for first degree murder is life imprisonment. There is no minimum for any other homicide.

57. 18 U.S.C. § 2381. The minimum is five years in prison. See also the anomalous twenty-five year mandatory sentence for attempting to rob with a dangerous weapon any person having custody of mail, money, or other property of the United States. 18 U.S.C. § 2114. Piracy is punished by a life sentence. 18 U.S.C. § 1651.

numerous special equities and mitigating circumstances in his favor.

Nor is this all. The general federal rule permits the court to supend all or part of a sentence imposed for any offense not punishable by death or life imprisonment.[58] Moreover, most criminals are eligible for parole after serving one-third of their term.[59] But Congress has made a special exception for narcotic offenders, denying them either probation or parole.[60]

The result of this sentencing scheme is that a convicted murderer,[61] kidnapper,[62] arsonist,[63] rapist, [64] traitor,[65] robber,[66] or saboteur [67] may receive a lighter sentence than is mandatorily imposed on an addict who possesses narcotics more than once. And all these dangerous felons may be eligible for release before the hapless addict if they are sentenced to any term less than thirty years.

■ We recognize, of course, that probation and parole are matters of legislative grace which Congress may in its discretion deny.[68] We do not dispute Congress' right to set minimum prison terms. And we defer to any reasonably defensible congressional judgment as to the relative seriousness of different offenses. But we think any judgment that mere possession of unstamped narcotics to meet a compelling personal need is a more heinous offense than many murders, arsons, rapes, or kidnappings would be arbitrary and capricious. The only plausible justification for punishing such possession more severely is that, though less serious, it is harder to deter. But that rationale, while entitled to consideration, cannot support a penalty "out of all proportion to the offense" [69] or to the culpability of the offender. Appellant's ten-year sentence, without provision for treatment, probation, or parole, "excite[s] wonder in minds accustomed to a more considerate adaption of punishment to the degree of crime." [70] We are constrained to hold that on this record the sentence imposed is a cruel and unusual punishment in violation of the eighth amendment.

The disposition of the case on this holding, however, presents something of a dilemma. We are reluctant to intrude upon the congressional prerogative by dismantling the narcotics sentencing statutes brick by brick until we reach a constitutionally acceptable result.[71] And

58. 18 U.S.C. § 3651.

59. 18 U.S.C. § 4202.

60. *Supra* note 10.

61. See note 56, *supra*.

62. 18 U.S.C. § 1201.

63. 18 U.S.C. § 81. There is no minimum sentence for arson even if life has been placed in jeopardy, *cf.* note 51, *supra*.

64. 18 U.S.C. § 2031.

65. *Supra* note 57.

66. 18 U.S.C. § 2111 *et seq.* But see note 57, *supra*.

67. 18 U.S.C. § 2152 *et seq.*

68. *E. g.*, Stewart v. United States; Vera v. United States; both *supra* note 19.

69. Robinson v. California, *supra* note 9, 370 U.S. at 676, 82 S.Ct. at 1425 (opinion of Douglas, J.).

70. Weems v. United States, *supra* note 20, 217 U.S. at 365, 30 S.Ct. at 548.

71. 21 U.S.C. § 174, *supra* note 41, provides for a ten-year minimum term and incorporates by reference the denial of probation and parole of I.R.C. § 7237(d) (1954). It contains no severability clause. Accordingly, we doubt that we can separate the elements of Appellant's sentence on count 2. Appellant's concurrent ten-year sentence on count 1 was imposed under subsections (a) and (d) of the same I.R.C. § 7237. There is a general severability clause applicable to the entire Internal Revenue Code. I.R.C. § 7852(a) (1954), 26 U.S.C. § 7852(a). But it may well be that § 7237, like 21 U.S.C. § 174, *supra*, establishes an integrated sentencing scheme which we are not at liberty to tamper with. *Cf.* United States v. Marchetti, 390 U.S. 39, 58–60, 88 S.Ct. 716, 19 L.Ed.2d 906 (1968); Weems v. United States, *supra* note 20, 217 U.S. at 381–382, 30 S.Ct. 544. If so, the question of the constitutionality of the ten-year minimum sentence alone, subject to probation and/or parole and/or provision for treatment, is not before us.

it is not clear that a court has authority, under Section 2106 of Title 28 of the United States Code or any other statute, to impose a lighter sentence.[72] But since we do not hold that Appellant could not constitutionally be punished, and since the question of disposition has not been briefed or argued, we hesitate to resolve the matter without affording the parties an opportunity to present their views. We therefore invite Appellee to submit a brief within thirty days; if he does so, we invite Appellant to respond within twenty days of the date Appellee's brief is filed.[73] After receipt of any such memoranda, we shall advise the parties whether oral argument is required.

So ordered.

## McGOWAN, Circuit Judge:

I have never been able to understand how, short of being given narcotics un-

der duress, one can be a narcotics addict without periodically possessing narcotics. If the Eighth Amendment, as the Supreme Court held in Robinson v. California, 370 U.S. 660, 82 S.Ct. 1417, 8 L. Ed.2d 758 (1962), prohibits a state legislature from making addiction a crime, then surely Congress is under a similar restraint. But, under existing federal statutes, an addict, upon proof of possession alone, goes to prison without even the benefit of probation or parole. This comes about because the proof of possession of any amount of narcotics, no matter how small, is enough to convict one of such acts as purchasing, receiving, or concealing narcotics—acts which seem to me realistically inseparable from the status of addiction.[1]

This is a double standard of constitutional interpretation with a vengeance—

---

72. *Cf.* Weems v. United States, *supra* note 20 at 382, 30 S.Ct. at 555, where the Court said:

It follows from these views that, even if the minimum [authorized] penalty * * * had been imposed, it would have been repugnant to the Bill of Rights. In other words, the fault *is* in the law, and, as we are pointed to no other under which a sentence can be imposed, the judgment must be reversed, with directions to dismiss the proceedings.

73. In addition to any other matters affecting disposition, we suggest that the parties address themselves in particular to the following questions:

(1) Can and should this court separate the sentencing scheme into its distinct provisions and determine whether the excision of one or more of the provisions would yield a constitutionally permissible sentence?

(2) If the congressional scheme is so divisible, which provisions must be excised? What sentence would not be excessive under the eighth amendment?

(3) If on the other hand Congress must decide which parts of its prescribed sentence it values most, must this court reverse the conviction for lack of a law under which Appellant can be sentenced, or is there some other less drastic disposition of the case?

1. In *Robinson* the majority strove manfully to minimize the reach of its de-

cision by analogizing narcotics addiction to the condition of suffering from such illnesses as leprosy—a dubious parallel indeed since leprosy does not, so far as I am aware, disappear by a willed effort to stop doing something. A concurring Justice purported to conceive of addiction as nothing more than a disposition to use narcotics. This is like defining an alcoholic as one who likes the taste of whiskey but does not drink it. But, as Justice White pointed out in dissent, "[a]s defined by the trial court, addiction *is* the regular use of narcotics and can be proved only by evidence of such use." It is this same realistic perception and acceptance of the relationship between the status of addiction and the use of narcotics which caused Justice White to assert in Powell v. Texas, 392 U.S. 514, 548, 88 S.Ct. 2145, 2162, 20 L.Ed.2d 1254 (1968), that: "Unless *Robinson* is to be abandoned, the use of narcotics by an addict must be beyond the reach of the criminal law." The concept of an addict using narcotics without ever possessing, purchasing, receiving, or concealing them is surely beyond the bounds of practical logic. Thus when the *Robinson* majority says that criminal sanctions may be imposed with respect to the possession of narcotics, I can only assume it does not intend to include possession by addicts not engaged in trafficking.

one rule for the state legislature, another for the national. I thought so when, as a member of the panel in Castle v. United States,[2] I joined in leaving correction to the Court which seemingly had created the imbalance. Meanwhile, four years later, we are presented with another record not unlike that involved in *Castle*. I think the time has come to make the Constitution speak with the same voice in the District of Columbia as in California.

There is a vast difference between using drugs and trafficking in them. It is a difference which Congress has, since *Robinson*, explicitly recognized.[3] That recognition has not gone so far as to result in a rational reexamination and revision of the federal criminal statutes themselves, but, pending that event, I believe that *Robinson*, so long as it stands, compels either invalidation of those statutes as applied to a record like the one before us, or an interpretation of them as limited to trafficking—an offense neither alleged nor proved here.

ROBB, Circuit Judge (dissenting):

The majority opinion holds unconstitutional that part of the Narcotic Addict Rehabilitation Act of 1966 which excludes from those eligible for treatment "an offender who has been convicted of a felony on two or more prior occasions", when that provision is applied to one whose prior felony convictions for narcotic law violations occurred before the effective date of the Act. The opinion

finds a deprivation of equal protection of the laws because "an addict who, at the time the 1966 Act became law, did not have two prior convictions is not disqualified from disposition under the new and enlightened provisions of the Narcotic Addict Rehabilitation Act," while "one who, like appellant, suffered criminal narcotics convictions on two occasions before 1966, is denied the rehabilitative possibilities of the new approach."

The majority correctly states the effect of the 1966 Act: it benefits some addicts while it denies treatment under its provisions to other addicts. But this is not necessarily a denial of equal protection of the laws under the Fifth and Fourteenth Amendments, for equal protection does not always require identity of treatment. The requirement of equal protection has always permitted legislative classification, so long as the classification is reasonable, rests "on real and not feigned differences", the distinction has "some relevance to the purpose for which the classification is made", and the different treatments provided by the legislative enactment are not so disparate, "relative to the difference in classification, as to be wholly arbitrary". Walters v. City of St. Louis, 347 U.S. 231, 237, 74 S.Ct. 505, 509, 98 L. Ed. 660 (1954). Legislative enactments, the Supreme Court has said, offend the constitutional safeguard of equal protection "only if the classification rests on grounds wholly irrelevant" to achieve-

2. 120 U.S.App.D.C. 398, 347 F.2d 492 (1964), cert. denied, 381 U.S. 953, 85 S.Ct. 1811, 14 L.Ed.2d 726, rehearing denied, 382 U.S. 874, 86 S.Ct. 13, 15 L.Ed. 2d 16 (1965).

3. The Narcotic Addict Rehabilitation Act of 1966, 80 Stat. 1438. The substantive provisions of this statute are preceded by a declaration of Congressional policy to the effect that addicts convicted of or charged with narcotics offenses should be civilly committed for rehabilitative treatment rather than criminally punished. In the definition of those eligible to be civilly committed rather than prosecuted, an exclusion is made of those

"charged with unlawfully importing, selling, or conspiring to import or sell" narcotic drugs. 28 U.S.C. § 2901(g) (2). These are, of course, the acts customarily associated with trafficking. The definition of those who, although convicted, are eligible for civil commitment as opposed to criminal sentencing contains the same exclusion although mitigated in this instance by a proviso that eligibility continues if "the court determines that such sale was for the primary purpose of enabling the offender to obtain a narcotic drug which he requires for his personal use because of his addiction to such drug." 18 U.S.C. § 4251(f) (2).

ment of the government's objectives. McGowan v. Maryland, 366 U.S. 420, 425, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961). Legislatures "are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality" and "a statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it". 366 U.S. at 425–426, 81 S.Ct. at 1105. See also Rinaldi v. Yeager, 384 U.S. 305, 308–309, 86 S.Ct. 1497, 16 L.Ed.2d 577 (1966); Baxstrom v. Herold, 383 U.S. 107, 111, 86 S.Ct. 760, 15 L.Ed.2d 620 (1966). Moreover, in deciding the constitutional propriety of a limitation or exclusion in a reform measure such as the Narcotic Addict Rehabilitation Act we should be "guided by the familiar principles that a 'statute is not invalid under the Constitution because it might have gone farther than it did,' Roschen v. Ward, 279 U.S. 337, 339 [ ], that a legislature need not 'strike at all evils at the same time,' Semler v. [ ] Dental Examiners, 294 U.S. 608, 610 [ ] and that 'reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind,' Williamson v. Lee Optical Co., 348 U.S. 483, 489 [ ]." Katzenbach v. Morgan, 384 U.S. 641, 657, 86 S. Ct. 1717, 1727, 16 L.Ed.2d 828 (1966).

Turning to the statute under consideration in the light of these principles I see nothing unreasonable or arbitrary in a congressional judgment that an addict who is a hardened offender twice previously convicted of a felony, whether before or after 1966, is not a likely prospect for rehabilitation. Sympathy for the addict may suggest to some that he ought to be eligible for treatment, but sympathy does not justify a court in re-writing the statute, striking down one of its limitations, and thereby overriding a rational judgment of Congress. It is not for a court on such grounds to substitute its views for those of the Congress.

I dissent. I would affirm both the conviction and the sentence.